Sean B. BUTLER, Appellant,

v.

UNITED STATES, Appellee.

No. 89–CF–1149.

District of Columbia Court of Appeals.

Argued June 11, 1991.
Decided July 21, 1992.
Certiorari Denied Nov. 30, 1992.
See 113 S.Ct. 625.

William S. Rhyne, McLean, Va., appointed by this court, for appellant.

Nancy R. Page, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Roy W. McLeese, III, Debra L. Long–Doyle, and Barry Wiegand, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and TERRY and STEADMAN, Associate Judges.

TERRY, Associate Judge:

A grand jury charged appellant Butler and a co-defendant[1] with two counts of kidnapping while armed,[2] one count of as-

---

1. Butler's co-defendant, Antoine Hayes, has separately appealed from his conviction. Although the two appeals would normally be consolidated and heard together, we have deferred consideration of Hayes' appeal, No. 89–CF–626, pending a ruling by the trial court on his motion for collateral relief under D.C.Code § 23–110 (1989).

2. D.C.Code §§ 22–2101 and 22–3202 (1989).

sault with a dangerous weapon (ADW),[3] and two counts of first-degree felony murder while armed.[4] Butler was also charged with one count of first-degree premeditated murder while armed,[5] and carrying a pistol without a license.[6] A jury found Butler guilty on all the charges except first-degree premeditated murder, as to which he was found guilty of the lesser included offense of second-degree murder. On appeal he challenges the voluntariness of a statement he gave to the police, the trial court's redaction of certain portions of that statement, the court's refusal to sever his case from that of his co-defendant, the admissibility of a dying declaration made by the murder victim, the sufficiency of the evidence as to certain counts, the instructions on felony murder, and the trial court's sentencing scheme. We reject all of Butler's claims of error and affirm the judgment of conviction.

## I

Frances White lived in a house on I Street, N.E., with her eighty-three-year-old grandmother, Rosa White. The grandmother rented rooms in her house to Michael King, Sterling Queen, and Carroll Hawkins. Frances White had a strong dislike for Hawkins because he "felt as though the house was his and he wanted to rule everything and everybody." On March 29, 1989, White had a heated argument with Hawkins, but her grandmother intervened and suggested that she go out for a while to calm herself down. White agreed and went to visit an aunt.

Early the next morning White returned home with her friend Gary Stuckey. Another aunt, Gwen Taylor, who also lived in the house, returned at about the same time. Rosa White was not at home, however, and some of her clothing was missing. Frances White learned from King and Queen that her grandmother had packed some clothes and left in a cab with Hawkins. Worried about her grandmother, White went to a nearby store to call the police. There she met appellant Butler, whom she knew from the neighborhood, and a friend of his, Joseph Cunningham, who worked at the store as a security guard. Butler and Cunningham offered to help in the search for White's grandmother and went back to the house with White.

Shortly thereafter the police arrived in response to White's call. They questioned all who were present[7] and then left, saying they would be back in a few minutes. Queen then tried to leave, but Hayes ordered him to stay. When the police returned to ask more questions, Queen complained that Hayes would not let him leave. After the police left again, Hayes hit Queen with Queen's cane because he was angry that Queen had complained to the police.

White suspected that King knew more about her grandmother's whereabouts than he was admitting. The assembled group decided to interrogate him further. They asked him what the grandmother and Hawkins had been talking about just before they left, and when King said he had not heard their conversation, Hayes hit him with his fist. Hayes then handed to Cherry a .32 caliber pistol[8] which he had in his pocket, and Cherry threatened to "do" King with it "if he didn't tell us what we wanted to know." Hayes then took the pistol back from Cherry. At about the same time, White saw Butler reach behind his back and pull out a short-barreled pistol, which White recognized as a .38 caliber revolver.

King finally mentioned an address where he thought White's grandmother might have gone, and Taylor, Cunningham, Cherry, and Stuckey left to see if the grandmother was there. This left Butler, Hayes,

3. D.C.Code § 22–502 (1989).

4. D.C.Code §§ 22–2401 and 22–3202 (1989).

5. D.C.Code §§ 22–2401 and 22–3202 (1989).

6. D.C.Code § 22–3204 (1989). An additional ADW count was dismissed before trial.

7. The assembled throng included Antoine Hayes and Chris Cherry, who had come in shortly before Frances White left to call the police.

8. White identified it as a .32 caliber pistol because Hayes "said it was a .32."

and White alone in the house with King and Queen. Queen was told to keep his eyes shut, and on one occasion when he opened his eyes, either Hayes or Butler struck him with an object (Queen thought it was his own cane), causing him briefly to lose consciousness. His shirt by this time was drenched with his blood.

White and Hayes moved King into the living room. Butler took the bullets out of his gun and then held the gun to King's head while pulling the trigger until the firing mechanism "clicked." White urged him to stop, saying, "You don't have to put the gun to his head, don't do that." [9] White then went out to get some cigarettes. As she left the house, she asked Butler not to do anything else to King "as far as hitting him or anything" until she returned.

At about 3:30 a.m. four off-duty police officers, including S.T. Vines, drove into the neighborhood to visit Vines' brother, who lived across the street from White's house. As they approached Vines' brother's house, the officers heard someone moaning and stopped the car. Officer Raymond Harris got out of the car and saw Butler and Hayes leaving the house where the moaning had come from. Both Butler and Hayes had guns in their hands. When Harris pointed them out to his companions, Butler and Hayes started to run down the street. The officers pursued them, but they ran into an alley, climbed over a fence, and disappeared. As they fled, Hayes fired his gun at one of the officers.

Frances White was returning to the house with her cigarettes when she heard a shot and saw two of the police officers in a car in the alley. White then ran inside the house, where she found King lying on his back, wounded. Butler and Hayes were gone. King told White, "They shot me." Queen was in the house, still sitting on the couch with his eyes closed, but he did not know who shot King. King died later that day from a single gunshot wound, caused by a bullet from a .38 caliber revolver. The evidence established that the bullet could not have come from a .32 caliber gun.

Two days after the shooting, Butler came to White's house and told her that "his conscience was bothering him about what he did." Butler then admitted that he had "shot that man." The police learned that Butler had knowledge of the crime and asked him to make a statement. Butler gave the police a videotaped statement on April 3, but he was not arrested until April 26.

II

Butler moved before trial to suppress his videotaped statement on the ground that it was involuntary. After a hearing, the court denied his motion. Butler argues that this ruling was error, contending here, as he did below, that his statement was coerced by police threats to arrest him if he did not give a statement.

The hearing on Butler's motion to suppress his statement began in the morning of the first day of trial, before the jury was sworn. Detective Willie Jefferson testified that on April 3 he and Detective Julia Crosby went to the house where Butler lived with his mother and grandmother. According to Jefferson, Butler agreed to accompany them to the police station and make a statement. Jefferson said that he and Detective Crosby "would have left" if Butler had refused to accompany them. Jefferson also testified that he told Butler at the police station that he was not under arrest and that he would be free to leave after he gave a statement. Detective Jefferson stated that Butler was free to leave at any time during questioning, although he was never asked whether he had actually told this to Butler:

Q. Had he told you that he didn't want to talk to you any longer, what would you have done?

A. Let him get up and walk out. It has happened before.

Q. And why would you have done that?

A. Because I didn't have anything—I could not have charged Mr. Butler. I had nothing to charge him with.

9. While all this was going on, Queen was still sitting on the couch with his eyes closed.

On cross-examination Jefferson denied telling Butler that he would be arrested if he did not give a statement, and denied promising Butler that he "wouldn't be locked up" if he gave a statement.

Butler's grandmother, Ann Richardson, testified that when the detectives arrived at her house on the evening of April 3, they told Butler that he would be arrested if he did not accompany them to the police station, but that he would not be arrested if he went with them. Butler himself testified that Detective Jefferson told him that he would be arrested if he did not go with them, but that Jefferson promised him that he could go home that night if he gave a statement at the police station.

After hearing from these three witnesses, the court granted Butler's motion to suppress his videotaped statement, finding that the police "made it clear that if [Butler] didn't give a statement about what occurred, he would be locked up that night." The court ruled that the statement was involuntary

> because it was given only in exchange for a promise to be released that evening and not to be locked up, and that's based upon the testimony of the witnesses and credibility findings of the court and based upon the statements of [Butler] in the videotape itself, which makes perfectly clear that that was the only reason he gave the statement.

The hearing turned to other matters not relevant to this appeal. The court then recessed for lunch.

After lunch, the government moved to reopen the suppression hearing and introduce the testimony of Detective Crosby, who had not testified that morning. The court granted the motion. Detective Crosby then testified that she went to Butler's house with Detective Jefferson. Crosby denied that either of them told Butler that he would be arrested if he failed to give them a statement; on the contrary, she said, "we told him that he was not going to be arrested at that time, that we felt the case needed further investigation...."

She also testified that she and Jefferson told Butler that he did not have to come to the police station and give a statement. After Butler gave his statement at the station, Crosby testified, she and Jefferson called his mother into the room and "explained to her that she could take her son home and that we were going to continue the investigation, and we would let her know if we were going to charge her son." Detective Crosby admitted on cross-examination that the prosecutor had told her over lunch that the court had suppressed the videotaped statement that morning and that the prosecutor had asked her to testify that afternoon. She also admitted telling Butler that four off-duty police officers had identified him as being at the crime scene when, in fact, none of the officers had done so. She explained, however, that when she told this to Butler, she believed that the officers would be able to make such an identification.

After hearing from Detective Crosby, the court reversed its earlier ruling on the suppression motion. The court noted that the "factual issue at this point [was] whether [Butler] was told that if he didn't go down to Homicide with the detectives, that he would be arrested that night." That "simple fact" was the basis for its earlier ruling, "and that's the fact at issue now." The court, expressing concern that Detective Crosby had had an opportunity to discuss her testimony with the prosecutor after the statement had been suppressed, nevertheless found Crosby's testimony credible.[10] The court also found that both Butler and his mother were aware that Butler was not under arrest at the time of the statement, and that neither of them had been told that Butler would be arrested that night if he failed to give a statement. The court, noting that these were factual findings based upon Detective Crosby's testimony, concluded that Butler's motion to suppress was "not factually supported" and denied the motion.

■ Police threats or promises of leniency in exchange for a statement may,

---

**10.** The court specifically found Crosby to be "a credible witness," but expressly declined to make a credibility finding as to Jefferson's testimony.

but do not necessarily, make the statement involuntary. *See Beasley v. United States,* 512 A.2d 1007, 1016 (D.C.1986), *cert. denied,* 482 U.S. 907, 107 S.Ct. 2485, 96 L.Ed.2d 377 (1987); *United States v. Robinson,* 225 U.S.App.D.C. 282, 289, 698 F.2d 448, 455 (1983). Although voluntariness is an issue of law for this court to decide on the record, *Ruffin v. United States,* 524 A.2d 685, 691 (D.C.1987), *cert. denied,* 486 U.S. 1057, 108 S.Ct. 2827, 100 L.Ed.2d 927 (1988); *see also Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985) ("the ultimate issue of 'voluntariness' is a legal question"), we are nevertheless bound by the trial court's resolution of conflicting testimony about the circumstances under which the statement was made. *Ruffin, supra,* 524 A.2d at 691, citing *United States v. Alexander,* 428 A.2d 42, 49–50 (D.C.1981).

There was conflicting testimony about whether the police ever promised Butler that he would not be arrested if he gave a statement. The trial court, specifically resolving this conflict in favor of the government, found as a fact that the police did not threaten to arrest Butler if he refused to give them a statement. This factual determination is binding on us. *Ruffin, supra,* 524 A.2d at 691; *see Martin v. United States,* 567 A.2d 896, 907 (D.C.1989) (appellate court "cannot overturn or look behind" trial court finding that police officer never promised to release defendant in exchange for his statement).

■ Our inquiry does not end here, however, for we must still determine whether, given the facts on this record, Butler's statement was voluntary. The record establishes that the police went to Butler's house, told him he was a suspect, and asked him to make a statement. At no time was Butler told that he would be arrested if he refused to make the statement. Butler argues nevertheless that the fact that he was told he could go home after he gave the statement shows that the statement was coerced. We disagree, because there is no evidence that Butler had any reason to believe that he would not be

allowed to go home if he failed to give a statement.

■ Butler argues that the trial court's failure to make a credibility determination with regard to Detective Jefferson, see note 10, *supra,* requires reversal. We conclude that the court did not need to make such a finding. The critical issue was whether the police promised Butler anything—specifically, his freedom—in exchange for his statement. The court found, on the basis of Detective Crosby's testimony, that they had not. Detective Jefferson's testimony did not contradict this finding, for he denied promising not to arrest Butler in exchange for his statement. The court's findings thus did not depend on Jefferson's testimony.

For these reasons we affirm the denial of Butler's motion to suppress his videotaped statement to the police.

### III

One of the principal issues on appeal is whether the trial court erred in redacting Butler's statement to such an extent that he was precluded from introducing parts of it that supported his defense. Because Butler implicated his co-defendant Hayes in his statement to the police, the trial court ordered that the statement be redacted so as to eliminate any reference to Hayes, thereby foreclosing any *Bruton*[11] claims that Hayes might raise. *See Carpenter v. United States,* 430 A.2d 496, 504 (D.C.) (en banc), *cert. denied,* 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981) (redaction of co-defendant's statement is a permissible way of avoiding *Bruton* problems). Butler then moved for permission to introduce the entire statement on the ground that he was entitled to have the jury hear all of it, not just the damaging portions, under the "rule of completeness." After a hearing, the court granted Butler's motion in part and denied it in part, redacting certain portions of the statement but ordering that other portions remain unredacted. An edited version of the videotape containing the fi-

11. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

nal additions and redactions was played for the jury and later admitted into evidence.[12]

Butler argues that the trial court erred in failing to allow him to introduce certain portions of his statement under the "rule of completeness." [13] He specifically contends that the trial court should have allowed him to introduce (1) his statement that he saw Hayes place a gun, which Butler identified as a .32 caliber pistol, to King's head and threaten to kill him, (2) his statement that Hayes fired at a police officer after leaving the house, (3) his statement that Hayes was a friend of Frances White, (4) his explanation that he struck Queen because Queen opened his eyes after he was told to keep them shut, and (5) his assertion that he never told White he had shot King.

■ The rule of completeness allows a party, once part of a document or recorded statement has been introduced into evidence, to seek admission of other parts of that same statement " 'in order to secure for the tribunal a complete understanding of the total tenor and effect of the [statement].' " *Warren v. United States*, 515 A.2d 208, 210 (D.C.1986) (quoting 7 J. WIGMORE, EVIDENCE § 2113, at 653 (Chadbourne rev. 1978)). This common law rule has been codified in Rule 106 of the Federal Rules of Evidence.[14] *See United States v. Sutton*, 255 U.S.App.D.C. 307, 330, 801 F.2d 1346, 1369 (1986). The federal courts have generally interpreted the rule to require that a statement be admitted in its entirety "when this is necessary to explain the admitted portion, to place it in context, or to avoid misleading the trier of fact." *United States v. Marin*, 669 F.2d 73, 84 (2d Cir.1982) (citations omitted).

■ But the rule "is not absolute." *Warren, supra*, 515 A.2d at 210. This court has made clear that the denial of a request to introduce additional portions of a statement under the rule of completeness should be reversed only if the trial court has abused its discretion. *Id.* at 210–211. Ten years ago the Eighth Circuit articulated the standard by which rule of completeness arguments are to be measured: "The rule of completeness is violated ... only where admission of the statement in its edited form distorts the meaning of the statement or excludes information substantially exculpatory of the declarant." *United States v. Kaminski*, 692 F.2d 505, 522 (8th Cir.1982). This standard has been adopted by several of the federal circuits. *See, e.g., United States v. Benitez*, 920 F.2d 1080, 1086–1087 (2d Cir.1990); *United States v. Long*, 900 F.2d 1270, 1279 (8th Cir.1990); *United States v. Alvarado*, 882 F.2d 645, 651 (2d Cir.1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990); *United States v. Thuna*, 786 F.2d 437, 441 n. 7 (1st Cir.), *cert. denied*, 479 U.S. 825, 107 S.Ct. 100, 93 L.Ed.2d 50 (1986); *United States v. Dorrell*, 758 F.2d 427, 435 (9th Cir.1985). We find it reasonable and adopt it here for the District of Columbia.

■ Butler challenges the trial court's refusal to allow the jury to hear five specific portions of his videotaped statement to the police. First, he maintains that the court should have allowed him to introduce the portion in which he said that Hayes had held a gun to King's head and threatened him. This statement, however, was not

---

**12.** The jury apparently did not get a transcript of the redacted statement.

**13.** Butler also contends that the trial court erred in failing to sever his trial from that of his co-defendant, maintaining that severance was required "[b]ecause [he] was entitled under the rule of completeness to the introduction of most of the portions which had been redacted...." In the trial court, however, although he sought severance on other grounds, he failed to assert this particular ground, and thus we do not consider it now. *See Miller v. Avirom*, 127 U.S.App. D.C. 367, 369–370, 384 F.2d 319, 321–322 (1967).

In any event, the success of his severance argument depends on the success of his challenge to the trial court's ruling on his "rule of completeness" motion, which he did adequately preserve for appellate review.

**14.** Rule 106 provides:

When a writing or recorded statement or a part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

"substantially exculpatory" of Butler, for it is undisputed that Hayes' gun was not the murder weapon; thus the fact that Hayes might have threatened King with a gun was essentially irrelevant to the issue of whether *Butler* shot and killed King with a different gun some time thereafter. Furthermore, introduction of this portion of Butler's statement would have violated Hayes' rights under *Bruton* and the Confrontation Clause of the Sixth Amendment. In deciding whether to admit redacted portions of a statement which implicates a co-defendant, the trial court may properly balance the interest of the declarant in introducing the complete statement against the co-defendant's Sixth Amendment rights. *United States v. Alvarado, supra,* 882 F.2d at 651. Because nothing in this redacted portion is "substantially exculpatory" of Butler, and because its introduction would have infringed Hayes' rights, we find no abuse of discretion in its exclusion.

■ Second, Butler asserts that the jury should have been allowed to hear the part of his statement in which he said that Hayes shot at the police officers after leaving the house. We see no abuse of discretion. At most, this remark established that Hayes had a gun, a largely uncontested fact, and that he shot at the police officers. Its omission neither exculpated Butler nor distorted the rest of his statement. The remark was not at all relevant to the issue of whether Butler shot King.

■ Third, Butler challenges the excision of his comment that Hayes was a friend of Frances White. Nothing about this comment was "substantially exculpatory" of Butler, nor did its deletion distort the rest of Butler's statement. Moreover, Butler could not have been prejudiced by this deletion because the government introduced other evidence that Hayes and White were friends.

■ Fourth, Butler argues that the trial court's exclusion of his explanation of why he struck Queen (namely, because Queen opened his eyes after being ordered to keep them shut) distorted his admission that he struck Queen because it left the jury with the impression that he was the sort of person who would attack someone else without reason. In *United States v. Dorrell, supra,* the Ninth Circuit rejected a similar argument by a person convicted of trespassing on government property for an unlawful purpose. The defendant in that case had confessed to entering a military base to destroy missiles, but stated that his actions were motivated by his strong political and religious beliefs. On appeal he challenged the trial court's removal of that explanation for his actions from his written confession. The appellate court held:

> [R]emoving Dorrell's explanation of the political and religious motivations for his actions did not change the meaning of ... his confession ... [and] did not alter the fact that he admitted committing the acts with which he was charged.... [His] motivation did not excuse the crimes he committed.

758 F.2d at 435. We adopt the same reasoning in this case. Butler's reason for striking Queen was not a legal justification for the assault, and was therefore irrelevant to any issue properly before the jury. The trial court did not abuse its discretion in excluding this portion of Butler's statement.

■ Finally, Butler maintains that the trial court should not have kept the jury from hearing that he denied admitting to White that he had shot King. The trial court was initially inclined to let this part of the statement in, saying, "It has to come in. It may not be convincing, but it is, in fact, his denial." Eventually, however, the court ruled that it would not restore the denial to the redacted statement if the jury could learn from other evidence that Butler had denied confessing the crime to White. The government later elicited that information from Detective Jefferson. Since this evidence was before the jury, Butler was not prejudiced by the redaction of the denial from the videotaped statement, and he is not entitled to reversal on this ground.

## IV

Butler contends that the government failed to introduce sufficient evidence to

support his convictions of kidnapping, assault with a dangerous weapon, and carrying a pistol without a license. These contentions are meritless.

### A. *Kidnapping*

Kidnapping includes the seizing, confining, or detention of another. D.C.Code § 22–2101 (1989). "The involuntary nature of the seizure and detention is the essence of the crime of kidnapping." *Head v. United States,* 451 A.2d 615, 624 (D.C. 1982) (citing cases).

 Butler was convicted of kidnapping both King and Queen. He now contends that there was insufficient evidence that either King or Queen was involuntarily transported, and that his conviction must therefore be reversed. This contention is without merit because "[a]sportation is not an essential element of the kidnapping statute." *Catlett v. United States,* 545 A.2d 1202, 1215 n. 29 (D.C.1988), (citation omitted), *cert. denied,* 488 U.S. 1017, 109 S.Ct. 814, 102 L.Ed.2d 803 (1989).[15]

### B. *Assault with a dangerous weapon*

 Butler argues that he should not have been convicted of assaulting Queen with a dangerous weapon because the evidence showed only that Hayes struck Queen with a cane. The government argues, in response, that Butler admitted in his videotaped statement that he had hit Queen because Queen had disobeyed his order not to look at him. As the government points out in its brief, even though Queen could not recall who hit him in the head (because his eyes were closed), Butler could.[16] Queen testified that either Hayes or Butler told him, "I'm not telling you any more, keep your eyes off me." He replied, "Okay, okay, okay," and turned his eyes away. At that point, he said, he was struck in the head with an object, and the blow knocked him out. The government contends that Queen's testimony, coupled with Butler's admission that he struck Queen, was sufficient to permit the jury to find Butler guilty of assault with a dangerous weapon.

The difficulty with this argument is that the indictment alleges that Butler and Hayes assaulted Queen "with pistols," and there is no evidence that the object used by one of them to strike him in the head was a pistol. Butler never mentioned either a cane or a pistol in the pertinent part of his videotaped statement, and the only relevant testimony from Queen identified the weapon as his own cane, not a gun:

Q. Did you ever get hit with a gun?

A. I don't think so, no.

Q. Do you have any idea what it was that you were hit with?

A. No, I think it was my cane.

It could perhaps be argued that the identity of the weapon was not an essential element of the offense, but the government does not make such an argument. Besides, if it did, we would have to consider whether proof that the weapon was a cane when the indictment charged a pistol was a material or non-material variance, an issue which could turn out to be quite complicated. We prefer instead to look at the other evidence in the record concerning Butler's use of a gun. Viewing the record as a whole, we conclude that there was ample evidence that both Butler and Hayes used their guns "in a menacing and threatening manner" toward King and Queen when they were trying to find out where Frances White's grandmother had gone, so that each could "reasonably ... believ[e] that the weapon might be immediately used against him...." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.12 (3d ed. 1978). This evidence, we hold, was suffi-

---

15. Butler does not contend, nor could he on this record, that there was insufficient evidence that King and Queen were involuntarily detained. There was testimony that Butler held a gun on King while asking him questions, and that Hayes and Butler were "guarding [King] like a prisoner." Queen testified that he was ordered to stay when he tried to leave the house. The jury could reasonably conclude from this and other evidence that both King and Queen were held against their will.

16. In one part of the videotaped statement which the jury heard, Butler said, "[W]hen I ask [Queen], don't look at me, and then ... he opened his eyes, and then I hit him one time."

cient to support Butler's conviction of assault with a dangerous weapon. *See Robinson v. United States,* 506 A.2d 572, 574–575 (D.C.1986); *Williamson v. United States,* 445 A.2d 975, 978–979 (D.C.1982).[17]

### C. Carrying a pistol without a license

■ Butler contends that there was insufficient evidence to support his conviction of carrying a pistol without a license because the evidence showed only that he "possessed" the pistol, but not that he "carried" it. He maintains that there was no evidence that he "carried the pistol into the rooming house or from place to place within it." Butler misunderstands the term "carry" as it relates to the offense of carrying a pistol without a license.

Conviction of carrying a pistol without a license requires proof of "(1) carrying an operable pistol, (2) without a license, and (3) with intent to do those two acts." *Tucker v. United States,* 421 A.2d 32, 34–35 (D.C. 1980) (citation omitted). The defendant must carry the pistol "openly or concealed on or about his person." D.C.Code § 22–3204 (1989). The trial court properly instructed the jury as to these elements.

■ Butler offers no support, and our research has revealed none, for his contention that one who "carries" a pistol must transport it "from place to place." [18] The evidence showed that Butler had a pistol on his person, which he pulled out and used to threaten King. Nothing more was required under section 22–3204.

### V

Frances White testified that when she returned to the house, she found King lying on his back, gravely wounded, and that King kept saying, "Weanie [White's nickname], help me, help me, Weanie, help me. They shot me, Weanie, help me." When defense counsel objected to this testimony, the parties discussed at a bench conference whether the part in which he said "They shot me" should be admitted as a dying declaration. Counsel for the co-defendant Hayes pointed out that, in order to make the statement admissible, King had to be aware that he was dying. The trial court replied, "He'd just been shot, and he was saying, 'Help me, help me, help me.' He seemed pretty aware to me." Addressing the prosecutor, the court said, "You have to establish that he knew he'd been shot," and then admitted the statement. Butler contends that the trial court erred in doing so.

■ "To make out a dying declaration, the declarant must have spoken without hope of recovery and in the shadow of impending death." *Shepard v. United States,* 290 U.S. 96, 99, 54 S.Ct. 22, 23–24, 78 L.Ed. 196 (1933). There is no requirement that the declarant actually state that he knows he is going to die; such knowledge may be inferred from the nature and extent of the declarant's wounds. *McFadden v. United States,* 395 A.2d 14, 16 (D.C. 1978); *accord, Lyons v. United States,* 606 A.2d 1354, 1359 (D.C.1992). Butler asserts that the court's statement that the government must prove Butler "knew he'd been shot" reflected an erroneous understanding of the law on dying declarations. That assertion, however, ignores the court's remark just a moment earlier that King "seemed pretty aware to me"—*i.e.,* aware that death was imminent—at the time he told White that "they shot me." Reading the court's two comments together, we are satisfied that the court had a correct understanding of the law, as set forth in *Shepard* and *McFadden,* when it ruled that King's statement was admissible.

Our review of this ruling is limited. *See* E. CLEARY, McCORMICK ON EVIDENCE § 282 at 830, § 53 at 135 n. 4 (3d ed. 1984) (trial judge's decision on the "preliminary fact

---

17. The jury was properly instructed in accordance with *Robinson, supra,* 506 A.2d at 574.

18. The government need only prove that the defendant either actually or constructively possessed the pistol in order to prove that he or she "carried" it, as that term is used in D.C.Code § 22–3204. *See Brown v. United States,* 546 A.2d 390, 394 (D.C.1988) (constructive possession requires showing of "dominion and control" over pistol). It is clear from the evidence that Butler exercised actual control over the weapon.

question of consciousness of impending death" will be affirmed if it is "reasonably supported by the evidence"); *McFadden, supra,* 395 A.2d at 16 (affirming because "[t]he record ... supports the trial court's conclusion that [the decedent] knew death was imminent"). The court's ruling in this case is reasonably supported by the evidence. At the time he made the statement, King had just been shot, had struggled to his knees, and then had fallen back to the floor. He died a few hours later. These circumstances provide a sufficient basis for the court to conclude that King was aware of his imminent death.[19]

## VI

◼ A person is guilty of felony murder if that person (1) inflicted a fatal injury upon the victim (2) while perpetrating or attempting to perpetrate one of six felonies enumerated in D.C.Code § 22–2401 (1989), one of which is kidnapping. *See Head v. United States, supra,* 451 A.2d at 625; *Waller v. United States,* 389 A.2d 801, 807 (D.C.1978), *cert. denied,* 446 U.S. 901, 100 S.Ct. 1824, 64 L.Ed.2d 253 (1980). The trial court instructed the jury that it could find Butler guilty of felony murder if it found (1) that he inflicted a fatal injury on Michael King and (2) that he did so while perpetrating or attempting to perpetrate the offense of kidnapping. CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.22(A) (3d ed. 1978). Butler contends that the court erred in refusing to instruct the jury that it must find, in addition to these two elements, that the killing was "in furtherance of the purpose to commit the kidnapping." We hold that the instruction was properly refused.

The requirement that the killing take place "in furtherance of" the underlying felony (as opposed to "during" or "in the course of" the underlying felony) applies only to aiders and abettors of the actual killer. *See* CRIMINAL JURY INSTRUCTIONS, *supra,* No. 4.22(C).[20] When one of the parties to a felony commits a killing "outside the scope of the felonious crime which the parties undertook to commit," the aiders and abettors of the felony cannot be convicted of felony murder. *United States v. Heinlein,* 160 U.S.App.D.C. 157, 169, 490 F.2d 725, 737 (1973). In *Heinlein* the court reversed the felony murder convictions of two aiders and abettors of a rape (David and Frank Walker) on the ground that the jury should have been instructed that the Walkers would not be liable for the killing of the rape victim by the third rapist (Heinlein) if they found that the killing was an unexpected response by Heinlein to being slapped by the victim. As the court said, "The D.C. felony-murder statute is addressed in terms only to the person who kills while perpetrating a felony. Accomplices ... are exposed to first degree murder accountability by reason of the aiding and abetting statute." The accomplice who aids and abets is criminally liable for a killing by the principal only if the killing is done "in furtherance of the common design or plan to commit the [underlying] felony, or [is] the natural and probable consequence of acts done in the perpetration of the felony." *Id.* at 167, 490 F.2d at 735. Thus the government must prove that the killing was done in furtherance of the underlying felony when it seeks to make an aider and abettor who did not actually do the killing liable for felony murder. In such a case the court must give an appro-

---

**19.** The government contends that the statement was also admissible as an excited utterance. Although the government is probably correct, *see, e.g., Lyons v. United States, supra,* 606 A.2d at 1358; *Young v. United States,* 391 A.2d 248, 250 (D.C.1978), we need not decide the point because we conclude that the statement was properly admitted as a dying declaration.

**20.** Instruction No. 4.22(C), captioned "When there are multiple defendants," states:

 If two or more persons, acting together, are perpetrating or attempting to perpetrate [a

felony] and one of them, in the course of the felony *and in furtherance of the common purpose to commit the felony* kills a human being, both the person who committed the killing *and the person or persons who aided and abetted in the felony* are guilty of murder in the first degree. [Emphasis added.]

By contrast, the felony murder instructions applicable to principals or single defendants, Nos. 4.22(A) and (B), do not contain the words "in furtherance of".

priate "furtherance" instruction. *See, e.g., Long v. United States,* 124 U.S.App.D.C. 14, 20–21, 360 F.2d 829, 835–836 (1966).[21] There is no requirement in the law, however, that the government prove the killing was done in furtherance of the felony in order to convict the actual killer of felony murder; hence the actual killer is not entitled to a "furtherance" instruction.

■ The evidence showed that Butler was the actual killer. He was seen with a gun in his hand that was probably the murder weapon and later confessed to White that he had "shot that man." Indeed, Butler does not challenge his second-degree murder conviction, an essential element of which is that he in fact killed Michael King. There was therefore no need for the trial court to instruct the jury on Butler's potential guilt of murder as an aider and abettor, and hence no need to instruct that the killing must have been committed "in furtherance of" the underlying felony of kidnapping.

## VII

The jury found Butler guilty as charged on six counts of the indictment (counts B, C, D, F, G, and I) and guilty of second-degree murder as a lesser included offense under a count charging first-degree premeditated murder (count E). Anticipating that some of the convictions might merge and have to be vacated, the trial court devised two sentencing schemes, "Alternative A" and "Alternative B."

Under Alternative A, which the court said would prevail if this court made no changes, Butler received twenty years to life for the felony murder of King (count F), based on the underlying felony of kidnapping King while armed. Concurrently with this sentence, the court imposed a term of one year for carrying a pistol without a license (count I). Butler was sentenced to ten to thirty years for kidnapping

Queen while armed (count C), to run consecutively to the sentence for felony murder. Finally, the court sentenced him to a term of one to ten years for assaulting Queen with a dangerous weapon (count D), to run concurrently with the sentence for kidnapping Queen while armed. The court did not impose any sentence for kidnapping King while armed (count B) or for second-degree murder (count E) because they merged with the felony murder conviction based on the kidnapping of King (count F). *See Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980) (felony murder merges with underlying felony); *Thacker v. United States,* 599 A.2d 52, 63 (D.C.1991) ("When there is only one killing, the defendant may not be convicted of more than one murder"). The court also observed that the felony murder conviction based on the kidnapping of Queen (count G) merged with the conviction of kidnapping Queen (count C). *Garris v. United States,* 465 A.2d 817, 823 (D.C.1983) ("where one killing is involved, and the government advances alternate theories of felony murder based upon more than one underlying felony, the accused may not be convicted of more than one felony murder"), *cert. denied,* 465 U.S. 1012, 104 S.Ct. 1013, 79 L.Ed.2d 243 (1984).

■ Under Alternative B, Butler received fifteen years to life for second-degree murder (count E). Consecutive to this sentence were concurrent sentences of fifteen years to life for kidnapping Queen while armed (count C), ten to thirty years for kidnapping King while armed (count B), one to ten years for assaulting Queen with a dangerous weapon (count D), and one year for carrying a pistol without a license (count I). No sentence was imposed on either of the two felony murder verdicts (counts F and G). Butler maintains that Alternative B is illegal in certain respects.

---

**21.** In *Long* one defendant (Huff) waited in the car while his co-defendants committed an armed robbery, in the course of which they shot and killed their victim. They returned to the car, and "Huff drove the car away from the scene, fully aware of what had taken place." 124 U.S.App.D.C. at 20, 360 F.2d at 835. In affirming Huff's conviction of felony murder, the court noted that the jury had been correctly instructed "that they were permitted to find Huff an aider and abettor if they believed his driving of the getaway car assisted in the flight of the culprits." *Id.* at 21, 360 F.2d at 836.

We do not consider this argument, however, because the court in fact sentenced him under Alternative A, not Alternative B. He lacks standing to challenge a sentence that was not actually imposed.

 As to Alternative A, Butler argues that his sentence for the felony murder of King and the kidnapping of Queen must merge. This contention is without merit. Under *Whalen* and its progeny,[22] felony murder merges with the underlying felony, but *only* that felony, and the trial court may impose a sentence for either the murder or the underlying felony, but not both. In this case the underlying felony was the kidnapping of King, not the kidnapping of Queen, which was an entirely separate crime. We therefore hold that the kidnapping of Queen (count C) and the felony murder of King based on the kidnapping of King (count F) did not merge, and that the trial court could and did properly impose sentences on both counts.

 Finally, we reject Butler's argument that the two kidnapping convictions merged with the murder and assault convictions. *See, e.g., Nelson v. United States,* 601 A.2d 582, 598–599 (D.C.1991). There was evidence that both King and Queen were detained for a significant period of time before King was murdered, and Queen's detention continued after he was assaulted. These detentions "cannot be deemed ... co-extensive or a necessary incident to [the other crimes of assault and murder.]" *Sinclair v. United States,* 388 A.2d 1201, 1208 (D.C.1978), *cert. denied,* 439 U.S. 1118, 99 S.Ct. 1026, 59 L.Ed.2d 77 (1979).

### VIII

For the foregoing reasons, the judgment of conviction is

*Affirmed.*

---

**22.** *E.g., Thacker v. United States, supra,* 599 A.2d at 63; *Catlett v. United States, supra,* 545 A.2d at 1218–1219; *Adams v. United States,* 502 A.2d 1011, 1026 & n. 22 (D.C.1986).