Antonio WILLIAMS, Appellant,

v.

UNITED STATES, Appellee.

No. 92–CF–1565.

District of Columbia Court of Appeals.

Argued April 21, 1994.

Decided June 9, 1994.

Sara E. Kopecki, with whom Robert E. Sanders was on brief, for appellant.

Steven D. Mellin, Asst. U.S. Atty., with whom Eric H. Holder, Jr., U.S. Atty., and John R. Fisher, Thomas J. Tourish, Jr., and Rachel Adelman–Pierson, Asst. U.S. Attys., were on brief, for appellee.

Before STEADMAN and FARRELL, Associate Judges, and PRYOR, Senior Judge.

FARRELL, Associate Judge:

Found guilty by a jury of assault with a dangerous weapon (D.C.Code § 22–502 (1989)), appellant assigns three errors relating to the conduct of the trial. Although we conclude there was error in the manner by which the prosecutor sought to impeach a defense witness, we find insufficient resultant prejudice to require reversal of appellant's conviction.

## I.

On the evening of August 23, 1991, the band "Raw Productions" played a free con-

cert in Fort Stanton Park. Appellant was a vocalist with the band that evening, and the complaining witness, Al Campbell, played bass guitar. When the concert ended and the band was breaking down its equipment, appellant began playing the drums. Campbell eventually asked him to stop playing and, when appellant refused, took the drum sticks from his hands. The pair shoved each other and exchanged ineffectual punches, until a third band member stepped between them and appellant walked away. Campbell continued disassembling his guitar, and as he was carrying it toward the band's truck, told appellant that "the only thing I did was to tell you to stop beating on the drums." According to Campbell and three other eyewitnesses, appellant yelled obscenities and words such as "This ain't over, it's not over yet." Appellant then hurdled a low stone wall and ran toward Campbell.[1] The two squared off, Campbell threw a punch that missed, and appellant responded by stabbing Campbell in the chest. (Although none of the government's witnesses actually saw the knife, appellant testified and admitted stabbing Campbell, claiming self-defense). Campbell was hospitalized for a knife-wound to the chest. Altogether four witnesses, including Campbell, testified that appellant was the aggressor in the fray in that it was he who had run toward Campbell after the initial fight terminated.

## II.

■ Appellant contends that the trial judge abused his discretion in permitting the government, on redirect examination of John Young, a band member and eyewitness, to introduce the entirety of a song Young had written chronicling the events of the August 23rd evening. The judge admitted the complete text of the song under the rule of completeness. The issue originated when, on cross-examination of Young, appellant's counsel established that Young was a friend of

Campbell and had written a song about the altercation with appellant. Counsel directed Young's attention to the last three sentences of the song, which stated in part, "[R]emember what I told you. You not locked up yet. It ain't over." Counsel asked if this language did not reveal Young's intent "to get even" with appellant.[2] Young replied that it was not his "place to get even," and that the words "It ain't over" were a phrase appellant had used at the time of the fight, which Young had "rephrased . . . into a meaning that I felt was safe to me."

On redirect examination of Young, over defense objection, Young was allowed to read the entirety of the song, which began by chronicling the band's successful performance that night ("They cranked, they grooved, they moved the crowd"), then blamed appellant for "start[ing] this mess" that followed:

> Couldn't handle yourself. You knew you were wrong. Started eating at your mind before too long. You took a walk with Hawk. We thought this mess was done. Walked down around the wall, then you started to run. Jumped over the wall.

> What happened next? Swung a hook, but, look, you stabbed Al in the chest. Wrong. Wrong. Two strikes not enough. Had to follow them across the street. You're tough. Stopped half way. *Started talking back, going after Hawk with a verbal attack. It ain't over. It ain't over. It ain't finished yet. Wrong. You finished, but we're not.*

> You want it to get hot, screaming, yelling, stabbing and telling. Everybody out there what was up. You wrote a check with your mouth. You couldn't cash with your—but take a listen and remember what I told you. You not locked up yet. It ain't over. [Emphasis added.]

■ In *Butler v. United States*, 614 A.2d 875 (D.C.), *cert. denied*, —— U.S. ——, 113

---

[1]. Appellant testified, conversely, that it was Campbell who had run toward him.

[2]. A moment before, counsel had asked Young whether he did not "want to do everything possible to see that Tony [Williams] goes to jail. . . ."

S.Ct. 625, 121 L.Ed.2d 558 (1992), this court stated:

> The rule of completeness allows a party, once part of a document or recorded statement has been introduced into evidence, to seek admission of other parts of that same statement "in order to secure for the tribunal a complete understanding of the total tenor and effect of the [statement]."

*Id.* 614 A.2d at 882 (quoting *Warren v. United States,* 515 A.2d 208, 210 (D.C.1986)). *See also Henderson v. United States,* 632 A.2d 419, 424 (D.C.1993) (citing this portion of *Butler* for a general explanation of the rule of completeness). We review the trial court's decision to admit or exclude a statement under this doctrine for abuse of discretion. *Butler,* 614 A.2d at 882; *Warren,* 515 A.2d at 211. Applying that standard, we sustain the judge's admission of the entire song. Appellant placed the last three sentences of the song before the jury as evidence of Young's bias as a witness—his desire to "get even." It was relevant to the strength of this inference whether the words "It ain't over yet" were Young's own, or whether in using them he was, in some measure, mimicking appellant's own words, perhaps facetiously. Although Young had already testified that appellant cursed and yelled "It ain't over" before assaulting Campbell, the jury's "understanding of the total tenor and effect" of the song itself, *Butler, supra,* was aided by knowing that some of the words attributed to Young—and implying bias on his part—appeared elsewhere in the song as appellant's own. The judge properly let the jury consider this context, especially since the risk of undue prejudice to appellant was slight: the jury learned that Young had written the song the day before trial at Campbell's request, and that it essentially repeated Young's testimony on which he had been fully cross-examined.

## III.

Appellant's next two claims of error have more substance, though ultimately we find that neither warrants reversal. Both arise from the impeachment of one of four defense witnesses, Maurice Tiller, assertedly about his ability to recall the events of the assault, and about his partiality as a witness.

### A.

■ Maurice Tiller was a keyboard player for the band on the night in question. On cross-examination, the prosecutor asked Tiller whether he had used cocaine that night or whether there was "[any]thing in [his] body or in [his] system" at the time that "would have [a]ffected [his] ability to remember or perceive" the events he had testified about. When Tiller answered "no" or "not that I know of" to these questions, the prosecutor introduced rebuttal evidence that he had tested positive for cocaine use on April 20 and September 13, 1991, four months before and three weeks after the date of the assault, respectively.

On appeal, the government contends that the prosecutor had a good faith basis to question Tiller about possible drug intoxication at the time of the assault, relying on the settled principle "that the 'use of narcotics [at the time of the offense] is a proper subject of inquiry going to the credibility of the witness in his recollection of the events in question.'" *Durant v. United States,* 551 A.2d 1318, 1326 (D.C.1988) (quoting *Jackson v. United States,* 377 A.2d 1151, 1154 (D.C. 1977)). We need not decide this point. Assuming the question was proper, the government appears to recognize in its brief that impeaching Tiller's denial by the admission of rebuttal evidence of his drug use at times so remote from the night in question cannot be justified on this theory of relevancy. Since evidence "that a witness is a drug user" may be "highly inflammatory," *Rogers v. United States,* 419 A.2d 977, 981 (D.C. 1980), our decisions teach that "a party offering extrinsic evidence to impeach a witness' denial of being under the influence of drugs at the time of the incident must first establish a sufficient evidentiary foundation that the witness in fact was under the influence of drugs at the relevant time." *Durant,* 551

A.2d at 1326. In *Durant* we rejected the admission of such evidence in temporal circumstances that seemed to bespeak considerably greater relevance than those presented here. We held that a government expert's general statement that PCP stays in the urine for up to two weeks, and evidence of the defendant's positive urine test for PCP *one day after the alleged crime,* "provided too slim a reed to support a conclusion that [the defendant] was under the influence of PCP at the time of [the charged] events, or had consumed PCP at such time as it would have been reasonable for the jury to infer that the PCP was affecting [his] behavior or ability to perceive and recall events." *Id.* at 1328.

■ In light of this precedent, the government instead takes a different tack on appeal. It points to the fact that Tiller denied *ever* using cocaine, and asserts that the prosecutor was "arguably" entitled to refute this broad denial under the doctrine of specific contradiction. But the government's equivocation is warranted because, as it concedes, this basis for impeachment applies only where the witness has "gratuitously offered" an asserted mistruth. *Patterson v. United States,* 580 A.2d 1319, 1323 (D.C.1990) (quoting *United States v. Beno,* 324 F.2d 582, 588 (2d Cir.1963), *cert. denied,* 379 U.S. 880, 85 S.Ct. 147, 13 L.Ed.2d 86 (1964)).[3] Tiller can scarcely be said to have volunteered such a denial. The prosecutor initiated the line of questioning about Tiller's possible drug use as follows:

Prosecutor: Mr. Tiller, it is true, isn't it, that you are a cocaine user?

Tiller: No, ma'am.

Prosecutor: It is not true?

Tiller: No.

Prosecutor: How can you say that? What [do] you mean by that when you say you are not a cocaine user?

Tiller: I don't use.

Prosecutor: You mean to say you have never used?

Tiller: Never use no drugs.

Prosecutor: In your entire life?

Tiller: In my entire life.

The trial judge correctly saw the irrelevance of this questioning and steered the prosecutor to the proper form of question (quoted earlier) focusing on Tiller's possible use of drugs at or around the time of the offense. But it clearly is not open to the government to argue that Tiller "gratuitously offered" a general denial which it was entitled to impeach with otherwise irrelevant evidence of his past drug use.

The parties dispute whether appellant adequately preserved this claim of error, the government contending we must apply a plain error standard of review. Our decision that the error was harmless, part IV, *infra,* makes it unnecessary to resolve this dispute.

### B.

■ Also on cross-examination of Maurice Tiller, the prosecutor elicited from Tiller over objection that he was currently awaiting trial in two separate cases charging him with distribution and possession of cocaine, respectively. The purpose of this inquiry, as one of the prosecutor's follow-up questions implied, was to suggest to the jury that Tiller "[didn't] like the police or the Government very much." On appeal, the government relies on two principles to support the questioning. The first is the general rule that "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimo-

---

3. In *Beno* the court stated:
   [W]here a defendant, in his direct testimony, falsely states a specific fact, the prosecutor will not be prevented from proving, either through cross-examination or by calling its own witnesses, that he lied as to that fact.... The rationale behind this rule is not difficult to perceive, for even if the issue injected is irrelevant or collateral, a defendant should not be allowed to profit by a gratuitously offered misstatement.
   324 F.2d at 588 (emphasis and citations omitted).

ny." *United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984). The second entails reverse application of the principle that cross-examination of a *government* witness about pending charges against the witness is allowed as an exception to the general rule "that prior arrests (save for reputation issues) are not admissible in evidence and are not proper subjects of cross-examination...." *Coligan v. United States,* 434 A.2d 483, 485 (D.C.1981). The purpose of the exception is that, "because the witness has a present personal liberty interest with the court system, such as a pending charge[,] ... the witness may have a motive to curry favor by testifying for the government." *Id.* (citations omitted); *see also Washington v. United States,* 461 A.2d 1037, 1038 (D.C. 1983). In permitting the cross-examination of defense witness Tiller about the pending charges against him, the trial judge stated that the "shoe fits on the other side equally." But the matter is not that simple.

■ The law generally prohibiting impeachment with the fact of arrests or criminal charges serves as an important check on the introduction of character evidence in criminal trials. Given the risk that evidence of such embroilment with law enforcement authorities may paint the witness (particularly a defendant) as a "bad man," *Marcus v. United States,* 476 A.2d 1134, 1139 (D.C. 1984), only limited exceptions are recognized to the rule excluding for impeachment purposes conduct that has not resulted in a conviction. In relying on one of these exceptions, the government would equate in regard to bias the personal liberty interest of a witness testifying for the government while charged with a crime with the *anti*-government bias said to motivate a defense witness similarly charged. Of course, a witness who has ever had criminal charges brought against him, particularly if they proved unfounded, could be thought to harbor a grudge against law enforcement, but the government does not extend its bias theory so widely; it argues only that the fact of present charges

gives the witness a motive to testify unfavorably to the government. And the reason, one assumes, is not that such testimony in the case at hand would help the witness in his own unrelated case; it is simply that the immediacy of his role as an accused in the criminal justice process gives him a motive to "get even" with his accuser.

■ We view this as too attenuated a theory of relevance, without additional circumstances, to justify a large-scale breach in the rule barring proof of arrests or criminal charges. A witness with a liberty interest in gaining preferential treatment from the government has a discernible bias, at least as a matter of relevance. Hence the right to question a government witness about a current adversarial relation to law enforcement enjoys constitutional protection, *see Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *Jenkins v. United States,* 617 A.2d 529, 531–33 (D.C.1992). But it is far less plausible to assume categorically that a witness awaiting criminal trial on charges unrelated to the present case is fired by anti-government hostility.[4] In general, the probative force of that inference is too slight to risk injecting the witness's (and associatively the defendant's) character into the criminal trial through reference to his arrest or pending charges.

This will not always be true, of course. *Staton v. United States,* 466 A.2d 1245 (D.C. 1983), the lone decision of this court on which the government relies, demonstrates the sort of link between extrinsic charges (or, as there, an investigation) against a witness and the case in which he testifies justifying admission of the former as proof of anti-government bias. The defense witness in *Staton* was a police detective who at trial contradicted the testimony of another detective about the complaining witness's statements at a showup identification. The detective was cross-examined about an internal police investigation of her performance begun after

4. The witness may, in fact, be an unwilling one (whom the defense has had to subpoena) precisely because of his fear of offending prosecutors in his own case.

she testified at the preliminary hearing consistently with her trial testimony but contrary to her affidavit in support of the arrest warrant. She acknowledged that her handling of the case had been criticized from the time of the showup by her superiors, who sought to transfer her from the Sex Squad. *Id.* at 1248–49. This court sustained the admission of evidence of the internal investigation and "the criticism which [the detective] had received in connection with her performance *on this case*," since it "may have generated feelings of hostility that colored her testimony at both the preliminary hearing and at trial." *Id.* at 1249 (emphasis added). Indeed, since the investigation concerned the very subject matter of her testimony, the witness might reasonably have thought (or so it could be argued) that the outcome of the trial, influenced by her testimony, could vindicate her performance.

Similar evidence of personal, even pecuniary motive (the detective's conflict in *Staton* was with her *employer*, the police department) inferable from the fact of arrests or charges is present in *Heath v. Cast*, 813 F.2d 254 (9th Cir.), *cert. denied*, 484 U.S. 849, 108 S.Ct. 147, 98 L.Ed.2d 103 (1987), also relied on by the government. The gravamen of the plaintiff's suit for damages under 42 U.S.C. § 1983 was that the police had violated his civil rights by arresting him without probable cause and using excessive force to subdue him. His brother also testified in his behalf. Both were impeached with evidence of the plaintiff's prior arrest and the brother's prior convictions resulting from arrests, all by officers from the same police department. The plaintiff's putative anti-police bias therefore coincided with his pecuniary interest in testifying that the police had used excessive force; as the court stated, the prior arrests related to his "motive in bringing this action." *Id.* 813 F.2d at 259.

Unlike the witnesses in these cases, Maurice Tiller had no more to gain by testifying

untruthfully than any other defense witness wanting to keep a friend out of jail.[5] His asserted desire to "get back at" the government for pending unrelated charges is too thin a reed on which to support the admission of charges that had the effect (together with the other impeachment evidence discussed above) of placing Tiller's character as a drug abuser before the jury. Thus, there was error in this aspect of the impeachment as well.

## IV.

■ Neither singly nor in combination, however, are we convinced that these errors warrant reversal of appellant's conviction. D.C.Code § 11–721(e) (1989); *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946) (nonconstitutional error does not affect substantial rights if reviewing court can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error ...."). First of all, the erroneous impeachment was of a defense witness, not the defendant himself. *See Outlaw v. United States*, 604 A.2d 873, 880 (D.C.1992) ("[i]n general, the risk of prejudice to the defendant from improper impeachment ... would seem greater if it is the defendant's own credibility that is being (unfairly) impugned"). Second, the evidence of Maurice Tiller's possible character as a drug abuser bore no intrinsic relation to the crime with which appellant was charged, assault with a dangerous weapon. *Cf. Bailey v. United States*, 447 A.2d 779, 782 (D.C.1982) ("The risk of jury misuse of prior conviction evidence is greatest when the crime charged and the crime used to impeach the defendant are similar"); *Dorman v. United States*, 491 A.2d 455, 459 (D.C.1984) (en banc). Third, Maurice Tiller was not the only defense eyewitness to support appellant's theory that

---

5. In *United States v. Bagaric*, 706 F.2d 42, 69 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983), the government was held to have properly impeached the defendant's wife with the fact of her brother's unrelated conviction. The conviction did not directly impugn the character of the witness or the defendant, and the evidence of bias it furnished coincided with the witness's particularly strong interest in the outcome of the trial, *i.e.*, keeping her husband out of jail.

Campbell had re-initiated the fight leading to the stabbing.[6] Phillip Tiller, Kevin Cook, and appellant himself all testified to the same effect. By contrast, four eyewitnesses for the government each testified that appellant, after having a chance to cool down, yelled "it ain't over," jumped over a brick wall, charged Campbell and stabbed him, despite the conceded fact that Campbell had no weapon in his possession. The issues of credibility the jury had to decide thus went far beyond simple evaluation of Maurice Tiller's testimony—which in turn may account for the fact, on which appellant relies, that the jury initially reported itself deadlocked. Because we are convinced that the errors in impeachment of Maurice Tiller did not affect the jury's verdict, the judgment of conviction is

*Affirmed.*

---

**6.** Maurice Tiller's testimony covers only eight pages of the trial transcript (only three relating to disputed facts) and asserted merely that

Campbell followed appellant just before appellant stabbed him and that appellant then left in the car of another band member, Phillip Tiller.