**Raymond L. SMITH, a/k/a Ronald M. Johnson, Appellant,**

v.

**UNITED STATES, Appellee.**

**Walter R. JEFFRIES, a/k/a Walter T. Jeffries, a/k/a Raymond Smith, Jr., Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 7184, 7317.**

District of Columbia Court of Appeals.

Argued Dec. 4, 1973.

Decided Feb. 21, 1974.

Rehearing en Banc Denied in No. 7317 March 25, 1974.

David C. Niblack, Washington, D.C., appointed by this court, for appellant Raymond L. Smith.

Nicholas A. Addams, Washington, D.C., for appellant Walter R. Jeffries.

William D. Pease, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before REILLY, Chief Judge, and FICKLING and HARRIS, Associate Judges.

FICKLING, Associate Judge:

Appellants Raymond L. Smith and Walter R. Jeffries were convicted in a jury trial of assault with intent to kill while armed (D.C. Code 1973, §§ 22–501, 22–3202), assault with a dangerous weapon

(D.C. Code 1973, § 22–502), and carrying a pistol without a license (D.C. Code 1973, § 22–3204). Appellants raise a number of issues: (1) prosecutorial misconduct; (2) certainty of complainant's identification; (3) denial of motions for severance; (4) refusal to allow expert testimony; and (5) failure to give missing witness instruction. We affirm.

On April 18, 1972, between 7 and 8 p.m., Leon Jackson met his girl friend, Marian Fletcher, and two other women in the vicinity of Fourteenth and T Streets, N.W. Jackson talked to Miss Fletcher for approximately five minutes; during their conversation she asked him if he had ever heard of "Cadillac" Smith. Jackson replied that he had not, and Miss Fletcher then pointed to appellant Smith and a second man, Charles "Rough House" McGill, who were standing together a short distance away. Jackson and Miss Fletcher subsequently parted company but agreed to meet later that evening. Jackson remained in that area to wait for Miss Fletcher's return.

At approximately midnight he became impatient and began looking for Miss Fletcher in order to tell her that he was returning to Annapolis.[1] Jackson came to an alley which runs between T Street and Wallach Place, parallel to Fourteenth Street, where he saw Miss Fletcher talking with another person. Jackson began walking down the alley toward Miss Fletcher, who, upon seeing Jackson, waved at him as if to tell him to go back. At the same time, Jackson saw two men walking toward him from the other end of the alley but he paid no attention to them. The men passed Jackson and then called out his name. He turned and saw that each man was holding a pistol. The shorter of the two men fired one shot which hit Jackson in his left buttock. Almost simultaneously with the first shot, the taller of the two men stepped forward; and, as Jackson fell to the pavement, the tall man fired a second shot which hit Jackson's left elbow as he raised his arm to protect himself. He saw their faces and recognized the taller of the two men as "Buddy" Jeffries, with whom he had had an altercation the preceding Saturday. The shorter man he recognized as "Cadillac" Smith, whom Miss Fletcher had pointed out earlier in the evening. The two assailants fled the scene and Miss Fletcher came over and held Jackson's head as he lay in the alley. On cross-examination at trial, counsel for appellant Jeffries elicited from both Jackson and Sergeant Carpenter of the Metropolitan Police Homicide Squad that Miss Fletcher had told Jackson after the shooting that appellants had been the ones who had shot him.

Two days later Sergeant Carpenter visited Jackson at the hospital. Jackson was shown a group of ten photographs, among which was included a photograph of each appellant.[2] Jackson positively identified each appellant's photograph and gave Sergeant Carpenter their corresponding nicknames.

During their conversation at the hospital, Sergeant Carpenter recalled that Jackson described appellant Jeffries as having been a Negro male, in his twenties, about 6′3″ tall, weighing 150 pounds, wearing a black leather coat, black boots and gloves. Appellant Smith was described as a Negro male, in his twenties, about 5′11″ tall, weighing 165 pounds, with short hair, wearing a red leather coat and a red and white "gangster" hat. Although it was not reflected in his notes, Sergeant Carpenter recalled that Jackson described appellant Jeffries as wearing a similar type of hat.

At a lineup on June 6, 1972, Jackson identified appellant Jeffries. At another lineup held on July 26, 1972, he identified appellant Smith.

---

1. Jackson was a cook at the United States Naval Academy in Annapolis.

2. Sergeant Carpenter had previously received appellants' names as possible suspects from a confidential informant.

Appellant Jeffries presented a defense of alibi. His mother, Connie Jeffries, testified that on April 18 appellant Jeffries returned to their home in northeast Washington sometime between 11 and 11:30 p. m., ate dinner, and went upstairs to soak his injured foot. Mrs. Jeffries' testimony as to appellant Jeffries' whereabouts on the evening of April 18 was essentially corroborated by his girl friend, Garnetta Phillips.

■ Appellants' principal contention is that certain comments of the prosecuting attorney throughout the trial were so prejudicial as to require reversal.[3] During either his opening, closing, or rebuttal arguments to the jury, the prosecutor stated: (1) that Marian Fletcher was "too scared to come and testify"; (2) that appellants were "killers"; (3) that they were "warriors in the night"; (4) that they were "dressed like gangsters"; (5) that appellant Jeffries was a "young buck"; (6) that a guilty verdict would be a matter of achievement and courage; and (7) that the presumption of innocence rule might not apply as much to the appellants as it might to others in less serious cases. After careful consideration of these alleged instances of prosecutorial misconduct, we hold in this case that these alleged errors do not rise to the level of substantial prejudice, which is necessary in order to reverse. Garris v. United States, D.C.App., 295 A. 2d 510 (1972); Cross v. United States, 122 U.S.App.D.C. 283, 353 F.2d 454 (1965).

■ To determine whether the prosecutor's misconduct caused substantial prejudice, the applicable test is:

[W]hether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error. [Gaither v. United States, 134 U.S.App. D.C. 154, 172, 413 F.2d 1061, 1079 (1969) (citations omitted); Garris v. United States, *supra* at 512 of 295 A.2d.]

Throughout the trial the court carefully restricted the jury's consideration to the relevant issues by admonitions and correcting instructions. Midway through the trial, the court instructed the jury to ignore the term "young buck" since it was irrelevant to the case. After the prosecutor's closing argument, the trial court instructed the jury as follows:

THE COURT: Ladies and gentlemen of the jury, during the prosecution's closing remarks he made some comment as to why the lady, Miss Fletcher, was not here and that she was not here because she was scared or otherwise. She's not here and the police officer couldn't find her. We don't know what's going on in her mind or why she's not here. The fact is that she isn't and the police officer couldn't find her. Now, why she's not here is unknown and not in the record. With reference to the defendants being killers; the defendants are not charged with killing. They're charged with assault with intent to kill. So killers presupposes a fact already having happened which did not occur in this case, and of course the term was improperly applied. . . .

Immediately after the prosecutor's rebuttal argument, the court instructed the jury:

THE COURT: Ladies and gentlemen, in argument Mr. Robinson again referred to their being dressed in those kind of clothes [gangster style] and coming down the alley. The Court admonishes you that the type of clothing relating to identification has nothing to do with their guilt or innocence or nothing to do with this case.

---

3. The Assistant United States Attorney who represented the government on this appeal is not the prosecutor whose trial tactics are questioned in this opinion.

We presume, unless the contrary appears, that the jury understood and followed the court's instructions. Hall v. United States, 84 U.S.App.D.C. 209, 211, 171 F.2d 347, 349 (1948). The jury, in addition, "must be credited with enough common sense and discrimination to enable them to evaluate properly conduct and remarks of counsel even when they offend ordinary standards of propriety." *Hall, supra* at 212, 171 F.2d at 350. In the instant case there was nothing to suggest that the jury did not comprehend and respect the admonitions of the trial court.

Moreover, the question of whether the improper remarks by the prosecutor required reversal was considered by the trial judge in a motion for a new trial. On review, "[m]uch reliance should be placed upon his judgment of the matter." *Hall, supra* at 212, 171 F.2d at 350. As the court stated in United States v. Goodman, 110 F.2d 390, 394 (7th Cir. 1940):

It is peculiarly within the knowledge of the trial judge whether remarks of counsel during the trial tend to prejudice the cause of a party. The courtroom atmosphere, prior remarks which have provoked the questioned statements, and other factors which cannot be appraised by a reviewing court may render remarks of counsel innocuous, although they may appear viciously prejudicial when removed from their setting.
. . .

Lastly, "[i]t is generally held that whether improper conduct of Government counsel amounts to prejudicial error depends, in good part, on the relative strength of the Government's evidence of guilt." Jones v. United States, 119 U.S. App.D.C. 213, 214 n. 3, 338 F.2d 553, 554 n. 3 (1964); *accord, Garris, supra* at 512 of 295 A.2d. Here, the evidence against the appellants cannot be fairly characterized as "paper thin." The government's proof established that Leon Jackson recognized the two men who had shot him as persons he had seen prior to the shooting. The gov-

ernment further established that Jackson positively identified appellants' photographs, assigning appellants' nicknames to the appropriate pictures, and positively identified appellants both at formal police lineups and in court. During the trial Jackson's credibility and powers of recollection were fully tested throughout lengthy direct and cross-examinations. Jackson's testimony therefore, if believed, constituted strong evidence of appellants' guilt.

Thus, because of the strength of the government's case and because of the correcting instructions by the trial judge and his commendable effort to keep the prosecutorial misconduct at a minimum, we do not think these alleged errors reached the level of substantial prejudice.

Appellants' next contention concerns the identification testimony of Leon Jackson. Appellant Smith contested the certainty of Jackson's identification of him at the lineup on July 26, 1972. At the lineup Jackson stated, "I think it's number 6 [appellant Smith]." The government, however, called Mr. Jackson as a rebuttal witness; he testified that he was sure of his identification of Smith at the lineup and that the statement, "I think it's number 6," was just a phrase of speech. Appellants do not contend the photographic and lineup identifications of them by Jackson violated any constitutional standards, but rather they argue the testimony of Jackson—the only identification witness—was inherently unreliable, raising the likelihood of misidentification; therefore, the court should have granted their motion for acquittal. *See* United States v. Telfaire, 152 U.S. App.D.C. 146, 147–148, 469 F.2d 552, 554–555 (1972) (per curiam).

This contention is not well founded. Jackson had seen his assailants on previous occasions. He had ample opportunity to observe them during the shooting. He identified them at the photographic session, at the lineups, and in court. The trial judge thought Jackson's testimony had "a

ring of truth to it." It cannot be said, therefore, that under these circumstances there was a very substantial likelihood of misidentification. Consequently, we think the court correctly denied the motion for acquittal.

Appellant Jeffries asserts that it was error for the court to deny his motions to sever his case from that of appellant Smith.[4] He argues that appellant Smith, who gained notoriety under the nickname "Cadillac," was so infamous a criminal that the jury could not give his defense impartial consideration. We disagree.

■ Whether appellants should have been tried together or severally was within the sound discretion of the trial judge. E. g., Hill v. United States, 135 U.S.App.D.C. 233, 418 F.2d 449 (1968); Super.Ct.Cr.R. 14. The trial judge, moreover, should only grant severance when the situation is such that the exercise of common sense and sound judicial judgment leads one to conclude that the defendant cannot have a fair trial. Allen v. United States, 91 U.S.App. D.C. 197, 202, 202 F.2d 329, 334, cert. denied, 344 U.S. 869, 73 S.Ct. 112, 97 L.Ed. 674 (1952).

■ In the instant case the trial judge took enough precautions to insure that appellant Jeffries received a fair trial. Prior to trial the court instructed all parties that Mr. Smith should not be referred to by the nickname "Cadillac," and during trial that nickname was scrupulously avoided. In addition, the prospective jurors were asked whether they had any knowledge of "Cadillac" Smith's reputation, and those jurors who said they had such knowledge were excused. Accordingly, we think the trial judge did not abuse his discretion when he overruled the motions for severance.

■ Appellant Jeffries' next contention concerns his proffer of the expert medical testimony of Dr. Oliver on the effect the drug Desoxyn has on the ability to see. The court ruled counsel for appellant Jeffries would not be permitted to inquire of Dr. Oliver as to the effects of this drug.

Similarly, we do not think the trial court abused its discretion in precluding this testimony. There was no evidence that Jackson had taken a high dosage of Desoxyn on the day of the shooting. The only evidence of drug usage by Jackson was his testimony that he took one tablet of Desoxyn a day as prescribed by his doctor for weight control. He said the drug did not make him "high," and that he could not remember whether he took a tablet on the day of the shooting. Thus to raise, through the testimony of Dr. Oliver, the inference that Jackson had taken a high dosage of Desoxyn which affected his ability to see would have been impermissibly speculative.

Appellant Jeffries' final contention—that it was error for the court not to give the missing witness instruction for Marian Fletcher—is without merit.

■ It is elementary "that a party's failure to utilize a witness 'peculiarly within his power to produce . . . whose testimony would elucidate the transaction' permits an inference that the testimony would have been unfavorable." Wynn v. United States, 130 U.S.App.D.C. 60, 64, 397 F.2d 621, 625 (1967) (footnotes omitted). In the instant case Jackson's testimony established that Miss Fletcher could have elucidated the events in question had she been available, but it was not within the power of the government to produce her as a witness. The testimony of both Jackson and Sergeant Carpenter established that Miss Fletcher had been neither seen nor heard from since the night of the shooting, even though considerable effort on the part of the police had been made to contact her and secure her appearance for trial. Her absence having been satisfactorily explained, the court properly exercised its discretion to deny appellant Jeffries' request for a missing witness instruction.

Affirmed.

---

4. Motions were made prior to the trial and again at the start of the trial.