Charles N. JOHNSON, Appellant,

v.

UNITED STATES, Appellee.

Eugene B. SCOTT, Appellant,

v.

UNITED STATES, Appellee.

Nos. 93–CF–17, 93–CF–335.

District of Columbia Court of Appeals.

Argued March 29, 1995.
Decided July 27, 1995.
Rehearing En Banc Denied Feb. 22, 1996.

Schwelb, J., filed concurring opinion.
Ferren, J., filed dissenting opinion.

Lisa Greenman, Public Defender Service, with whom James Klein and Jo–Ann Wallace, Public Defender Service, Washington, DC, were on the brief, for appellant Johnson.

Brian C. Plitt, Washington, DC, for appellant Scott.

Margaret M. Lawton, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Elizabeth Trosman, and Heidi M. Pasichow, Assistant United States Attorneys, Washington, DC, were on the brief, for appellee.

Before FERREN, SCHWELB, and FARRELL, Associate Judges.

FARRELL, Associate Judge:

These felony murder convictions, arising from a vehicular homicide committed during the asportation (or "carrying away") phase of a robbery and flight from the police, require us to consider the sort of causal link the government must demonstrate between the underlying felony and the killing in circumstances where the defendant has reasons in addition to the robbery to want to escape apprehension. Appellants contend primarily that the trial court's instructions to the jury allowed conviction upon too attenuated a causal connection between the robbery and homicide. We hold, to the contrary, that on the facts of this case involving a chase which began only minutes after the robbery assault took place, the instructions adequately insured that, before convicting, the jury found a significant motivational link between the defendants' desire to complete the robbery and the flight resulting in the homicide; and that no more was required. As we reject appellants' remaining contentions as well, we affirm all of their convictions.

I.

At approximately 4:00 p.m. on December 16, 1991, Katherine Childs was walking west on Kennedy Street, N.W., toward a bus stop at the corner of Kennedy and Fourteenth Streets. She noticed a Jeep Cherokee, which she later described as "two-toned," driving

slowly along Kennedy Street. As she walked, she heard footsteps behind her. According to an ambulance driver who witnessed the incident, a black male wearing a charcoal-gray coat grabbed twice for Ms. Childs' purse. Instinctively, she reached for her purse which fell into her hand as the shoulder strap fell to the ground.

Turning around, Ms. Childs saw a black male running away from her diagonally across Kennedy Street to the same Jeep Cherokee, in which another black male was waiting behind the wheel. The suspect opened the passenger door, held out his hands palms up, as if to show that his hands were empty, and got into the jeep, which drove away south on Fourteenth Street. Ms. Childs noted the jeep's license plate number as it pulled away. The ambulance driver also noted the license plate number and read it to his partner who wrote it down on a napkin. The two men spotted a policeman and reported the attempted robbery, giving the napkin with the license plate number to the officer.[1] He found Ms. Childs near the scene and broadcast a lookout over the police radio using Ms. Childs' and the witnesses' descriptions of the jeep and suspects.

Minutes later, between 4:05 and 4:10 p.m., Theresa Conroy arrived at her home at 1826 Varnum Street, N.W., and was helping her children out of the car when a gray Jeep Cherokee pulled up behind her. A black male wearing a green army-fatigue jacket jumped out of the passenger side of the jeep and approached her. When he appeared to reach into his coat to retrieve a gun, Ms. Conroy started to hand over her purse, whereupon the man grabbed it and pushed her back. He jumped into the jeep and the suspects drove east on Varnum Street at a normal rate of speed. Ms. Conroy called 911 and reported the robbery.

At about 4:15 p.m., Officer Bruce Nixon of the United States Park Police was driving north on Seventeenth Street, N.W., when he saw a Jeep Cherokee drive through an intersection ignoring a stop sign. Nixon noticed that the driver was a black male wearing a green shirt or jacket, but was unable to get a good look at the passenger. Intending to make a traffic stop, Nixon followed the jeep, turned on his emergency lights, and sounded his siren. The jeep did not stop but instead ran another stop sign and turned left onto Mount Pleasant Street. When Nixon sounded the siren again, the two men in the jeep turned around, looked at him, and accelerated as they turned onto Park Road. Nixon reported the chase to his dispatcher.

The chase ended when the jeep turned right onto Sixteenth Street into congested traffic and sideswiped a car that was stopped at a traffic light. It then careened into a bus stop where it struck Juan Zuluaga and his four-year-old sister, Anevia Puerta. The girl eventually died as a result of head injuries, and Zuluaga was seriously injured.

An unmarked Metropolitan Police car had also observed the chase and tried to block the jeep on Park Road, backing out of the way when it became apparent that the jeep was not stopping. Officer John Farr, one of three plain-clothed officers in the car, jumped out of the car and ran around the corner in time to see appellants flee from the jeep following the accident. Farr and other witnesses saw two men jump out of the jeep, one wearing a green army-fatigue jacket and the other a dark-colored jacket. A foot chase ensued. As they fled, the men discarded their coats, which the police recovered. Appellant Scott was apprehended as he was attempting to hide in a pile of lumber. He had eight dollars in his hand. Appellant Johnson was caught approximately fifteen minutes later coming out of a building. Ms. Conroy positively identified him as the man who had taken her purse.

Inside the jeep, which had been stolen four days earlier from a parking lot, police found scattered on the floor of the front passenger side a purse and its contents, which Ms. Conroy identified as belonging to her. Scott's fingerprint was lifted from the left front door of the jeep. Johnson's fingerprint was lifted from an envelope inside the jeep.

1. The police apparently lost the napkin, but appellants raise no issue of failure to preserve the evidence.

At trial, the government's theory was that Johnson was the driver of the vehicle and Scott the passenger at the time of the homicide.[2] The instructions given to the jury permitted it to convict Johnson either as principal (the driver) or as aider and abettor (the passenger), but allowed Scott's conviction only on the theory of aiding and abetting.

## II.

We first consider the claims of instructional error in regard to the felony murder convictions. Johnson contends that the instructions were defective in two respects: first, they "erroneously took from the jury the question whether there was an unbroken chain [of events] between the robbery and the fatality"; and second, they erroneously allowed the jury to convict him "if it found that the robbery played even the most minor role in causing death." Scott joins in these contentions, arguing that an attenuated causal connection between the robbery and killing was particularly harsh in permitting his conviction for felony murder as an aider and abettor.

## A.

As relevant here, the trial judge first instructed the jury on the attempted robbery of Ms. Childs and the robbery of Ms. Conroy, the latter forming the basis of the felony murder convictions. One element of robbery, the judge told the jury, was that the defendant, having taken the property, must have "carried it away," but "the least removal of the thing taken from the place it was taken satisfies the requirement of carrying away." The judge then turned to felony murder, instructing that the government had to prove beyond a reasonable doubt both that the defendant inflicted an injury or injuries on the deceased from which the deceased died, and that the injuries "were inflicted at the time that he was perpetrating or attempting to perpetrate the robbery of Ms. Conroy." To establish the second element, it was "necessary that the defendant robbed or

attempted to rob Ms. Conroy and that the defendant inflicted the fatal injuries in the course of that robbery." The judge defined "in the course of" in terms of two specific findings the jury had to make to convict. It first had to determine whether the robbery "was ongoing at the time the injuries were inflicted":

> I instruct you as follows: The offense of robbery requires that the property taken be carried away. The offense continues until such time as the property has been removed to a safe location and the defendant has effected his escape with the property.

> In order to find that the injuries occurred in the course of the robbery, the Government must prove beyond a reasonable doubt that at the time the car fled from the police on Park Road, *the defendant was still in the process of transporting the proceeds from the area of the crime to avoid apprehension and detection of the property.* [Emphasis added.]

The judge continued, however, by stating:

> It is not enough to show only that the robbery was ongoing. It must also be shown that the specific actions leading to the fatal injuries *were part of the defendant's efforts to successfully complete the robbery and were motivated at least in part by the defendant's desire to avoid apprehension with the stolen property.* [Emphasis added.]

The judge gave the last-italicized instruction because of what he considered "the unusual circumstances of this case," which involved both a "break in time"—the five to ten minute interval between the robbery assault and appellants' sighting by the police—and the existence of "other possible causes" for appellants' flight besides the robbery, *viz.,* their possession of a stolen vehicle and their having just ignored two stop signs. While recognizing that the defendant's intent or motivation is "not a specific normal requirement of felony murder," the "unique facts of this case" convinced the judge that unless the

**2.** To account for discrepancies in identification, the government's theory was that the appellants had taken turns driving.

jury could "find that [the defendants] were running from the police [at least in part] because of the desire to leave the robbery scene [unapprehended], ... it would [not be] felony murder"—hence the supplemented instruction, which was "really another way of saying that the robbery is ongoing."

### B.

■ The parties agree that, to convict a defendant of felony murder, the government must establish *some* causal connection between the homicide and the underlying felony. Mere temporal and locational coincidence is not enough: "[i]t must appear that there was such actual legal relation between the killing and the crime ... that the killing can be said to have occurred *as a part of the perpetration of the crime....*" *United States v. Heinlein,* 160 U.S.App.D.C. 157, 168, 490 F.2d 725, 736 (1973) (internal citations and quotation marks omitted; emphasis added).[3] Of course, the judge's instruction in this case said precisely that. He told the jury that, to convict of felony murder, it had to find both that at the time of the flight the defendant "was still in the process of transporting the proceeds from the area of the crime to avoid apprehension and detection of the property," *and* that the actions leading to the fatality were *"part of* [his] efforts to successfully complete the robbery and ... motivated at least *in part* by [his] desire to avoid apprehension with the stolen property" (emphasis added). Moreover, this instruction answered fully the causational concerns voiced by Johnson's counsel during the conference on instructions when she repeatedly stated:

> the bottom line is why did this accident happen. And did it happen because of these defendants' bad conduct in escaping from the robbery because they wanted to

make good their escape with the goods ... *or did it happen for unrelated reasons.* [Emphasis added.][4]

■ For this reason, there is no merit to Johnson's argument that the trial judge withheld from the jury consideration of "whether there was an unbroken chain between the robbery and the fatality." Told that conviction required proof that the defendant was still transporting the proceeds "to avoid apprehension and detection" and was still motivated partly "to avoid apprehension with the stolen property" when the fatality occurred, the jury could not have failed to find an unbroken chain of events—a direct causal link—between the robbery and homicide.

■ What Johnson really wanted, however, is more, and is revealed in part by the written instruction he submitted to the trial judge. Besides requesting "unbroken chain" language and a requirement that "the fatality must have occurred ... not for some other reason unrelated to the robbery," Johnson sought to require the jury to find "such a close causal connection between the robbery and the homicide that you can say if it had not been for the robbery, the fatality would not have occurred." Johnson correctly points out that, in the discussion of instructions, his counsel did not insist on this precise ("but for") language, but he argues that the judge should have used words requiring the jury to find (in Johnson's various formulations on brief) "a close and strong relationship," an "intimate[ ] connect[ion]," or a "direct and substantial caus[al]" nexus between the robbery and killing. By contrast, the instruction actually given (Johnson says) "never informed [the jury] that it was required *to evaluate the strength of the evidence* linking the events on Varnum Street and the events on 16th Street" (emphasis added).

---

3. Although the *Heinlein* decision does not bind this court, we have repeatedly cited with favor its discussion of the law of felony murder. *E.g., Butler v. United States,* 614 A.2d 875, 886 (D.C.), *cert. denied,* 506 U.S. 1009, 113 S.Ct. 625, 121 L.Ed.2d 558 (1992). Moreover, *Heinlein* is consistent in this regard with *Coleman v. United States,* 111 U.S.App.D.C. 210, 295 F.2d 555 (1961) (en banc), *cert. denied,* 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613 (1962), which is binding on us.

4. The same counsel twice echoed this point later: "The fatality must have occurred because of an attempt by the robber to execute the unlawful end of the robbery and not for some other reason unrelated to the robbery"; "they [the jury] should consider whether [the defendant] was motivated by something other—something unrelated to the robbery because that would be a complete defense."

We reject this argument, as we think it amounts to requiring one of two things, the first unacceptable, the second providing no basis for reversal in the circumstances of this case. Considered one way, the argument would require the jury to quantify the respective significance—to "evaluate the strength"—of different causal factors such as the robbery, possession of a stolen car, or traffic infractions whenever a defendant has several possible reasons for flight in the course of which a killing occurs. The upshot of demanding "a close and strong relationship"—certainly a *sine qua non* connection—between the felony and the homicide is to require the jury to find the former the preponderant, "determinant," or "primary" cause of the latter—in short, to assign a percentage causal weight approaching if not exceeding fifty percent.

First of all, we do not see how a jury could realistically be expected to unravel motives and make this weighting determination. Moreover, the requirement would threaten a transformation of our felony murder doctrine by making motivation or purpose—to be sure, motive for the flight, not the killing, but state of mind all the same—a central element of the crime. In practically any felony murder case the defendant may have additional reasons to want to avoid capture for the just-committed felony.[5] Requiring apportionment—"evaluation"—of the influence of such motives would sow confusion in what until now has been a fairly uncomplicated doctrine reflecting the legislature's relaxation of the *mens rea* requirement for killings, even accidental ones, committed in the course of the most life-endangering felonies. *See, e.g., Carter v. United States,* 96 U.S.App.D.C. 40, 43, 223 F.2d 332, 335 (1955) (upholding felony murder conviction upon instructions merely telling the jury it could not convict "unless the killing was done during the progress of the robbery; that asportation is an ingredient of robbery[;] and that it was for them to say whether that crime was still in progress when the shooting occurred").

■ Appellants' argument, however, may be the less ambitious one that in the case of a killing which the government concedes to be accidental during the post-assault or post-taking phase of a robbery, the causal connection between the two may become so weakened by the influence of unrelated factors that some sort of requirement of "substantial" causation is necessary to prevent injustice.[6] The government responds that, so long as an instruction based on *Heinlein* that rules out mere temporal and locational coincidence is given, any additional causal requirement is for the legislature and not the courts to prescribe. For our part, we do not think it would have engineered a dramatic change in our felony murder doctrine had the judge instructed the jury, on the facts of this case, that it had to find that avoidance of apprehension for the robbery was a "significant" or "substantial" cause of appellants' decision to flee, without need for further definition. But in the context of the court's entire instructions, and on evidence showing that the flight began as briefly as six minutes after the robbery assault, we do not think that the failure to give such an instruction was error.

■ As recited earlier, the judge told the jury that to convict of felony murder it had to find that at the time the car fled from the police, "the defendant was still in the process of transporting the proceeds from the area of the crime *to avoid*"—that is, for the purpose of avoiding—"apprehension and detection of the property" (emphasis added). Only by disregarding this instruction could we find merit in the point that when the judge then added the requirement "that the specific actions leading to the fatal injuries were part of the defendant's efforts to successfully complete the robbery and were motivated *at least in part* by the ... desire to avoid apprehension with the stolen property" (em-

---

5. So, for example, the defendant fleeing the scene of a store robbery may shoot a security guard or pursuing police partly in knowledge that he has an outstanding murder warrant.

6. As Johnson states at one point, "The reach of the felony murder statute is potentially so broad that, unless limiting principles are applied, it poses a danger to individuals whose conduct it was not meant to embrace...." *But see Long v. United States,* 124 U.S.App.D.C. 14, 20–21, 360 F.2d 829, 835–36 (1966).

phasis added), the four italicized words so diluted the causal requirement that *any* motivational influence of the robbery, no matter how slight or trivial, was enough to allow conviction. Viewed in its entirety, as it must be, *see, e.g., Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973), the instruction did not permit the negligible causal nexus appellants hypothesize.

Further, it would be altogether unrealistic to suppose that the jury found the robbery to have played only a trivial or inconsequential role in appellants' decision to flee apprehension. They robbed Ms. Conroy barely more than five minutes before the police took up pursuit. Circumstantial evidence allowed the jury to infer that Scott, the passenger, was still rifling through the contents of the purse when the police first caught sight of the jeep.[7] Suddenly hearing a pursuing siren could scarcely have left appellants unmindful—in a very urgent way—that they were carrying the booty of a robbery committed minutes before. Thus, a jury applying common sense could not have found this to be a trivial force in their motivation to flee, even if they were also driving a stolen vehicle and had run through two stop signs.

For these reasons, we reject appellants' argument that the instruction allowed their conviction upon too frail a causal connection between the robbery and killing—one tantamount to the mere coincidence of space and time rejected as inadequate in *Heinlein.* The instruction, in itself and in the context of evidence strongly implying a link between the robbery and appellants' decision to flee, was sufficient to require the jury to find a substantial causal relationship between the felony and resultant homicide.[8]

 We reach this conclusion both as to Johnson and as to Scott, the latter of whom the jury was permitted to convict only as an aider and abettor. In keeping with this court's decisions, *e.g., Christian v. United States*, 394 A.2d 1, 48 (D.C.1978), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979), the judge instructed the jury that Scott could be found guilty of felony murder only if the evidence showed that he and Johnson were "acting together [in] perpetrating or attempting to perpetrate a robbery and one of them [Johnson] in the course of that robbery and in furtherance of the common purpose to commit the robbery kill[ed] a human being...." By contrast, if "the conduct leading to the fatality was a completely independent product of the driver's [Johnson's] mind unrelated to the common effort to successfully complete the robbery," Scott could not be convicted of felony murder.[9] With respect to Scott, then, the instructions reinforced the necessity of a causal link between the robbery and homicide and allowed

---

7. When Officer Nixon first saw the vehicle roll through a stop sign, the driver's face was turned away from him in the direction of the passenger. The contents of Conroy's purse were then found strewn on the floor of the vehicle, and Scott was clenching eight dollars in his fist when apprehended.

8. Appellants claim that the prosecutor in summation sought to exploit the court's "at least in part" instruction by reminding the jury that even though the defendants "were possibly motivated in part to flee from the police because of traffic tickets [or] because they were in a stolen vehicle, it doesn't matter, as long as you find that in any part, in any way, they were motivated to avoid police apprehension because sitting right there in that vehicle were the proceeds of a robbery that they committed six minutes before. That's i[t]. That's it." At the same time, however, the prosecutor debunked as a "stretch[ of] the imagination" the idea that anything other than the robbery caused appellants to flee: "The process of escaping was the part and parcel of the robbery in this case. And that's why ... this is not a joyriding case. This is not a negligent homicide case. This is not a manslaughter case. It's a killing that occurred during the course of and commission of a robbery." Like the judge's instruction, the prosecutor's argument as a whole left no doubt as to her position that there was an immediate causal link between the robbery and appellants' flight.

9. The trial court's actual language at this point was, *"If you find* that the conduct leading to the fatality was a completely independent product of the driver's mind ..." (emphasis added). We reject out of hand Scott's argument that the italicized language shifted the burden of proof to him to prove that the flight to escape detection for the robbery was Johnson's own ("independent") idea or impulse. Scott made no objection to the disputed language, and in the context of the instructions as a whole squarely placing the burden of proof on the government, it could not have misled the jury.

conviction only if the jury found that flight was part of his "common effort" with Johnson, "acting together," to complete the robbery. The instructions fairly permitted Scott's conviction as an accomplice to felony murder.[10]

## III.

■ Johnson argues that the attempted robbery count concerning Katherine Childs was misjoined with the remaining charges under Super.Ct.Crim.R. 8(b). We disagree. In *Rhone v. United States,* 125 U.S.App.D.C. 47, 365 F.2d 980 (1966), the court sustained joinder under the corresponding federal rule where, as in this case, "appellants were charged with the joint commission of similar offenses minutes apart.... " *Id.* at 48, 365 F.2d at 981. This is not a case where, as in *Settles v. United States,* 522 A.2d 348 (D.C. 1987), "the two incidents were not closely connected in time or place" or where there was no "real congruence between the two incidents, but only a few superficial similarities." *Id.* at 353. *See also Jackson v. United States,* 623 A.2d 571, 580 (D.C.1993) ("[T]he incidents occurred at different stores on different dates."); *Davis v. United States,* 367 A.2d 1254, 1261 (D.C.1976), *cert. denied,* 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 114 (1977) (offenses occurred at a different time of day and place). Here, the attempted robbery of Childs and the robbery of Conroy took place only blocks apart and within ten minutes or less of one another. Both involved the snatch or attempted snatch of the victim's purse by two men in a Jeep Cherokee. Moreover, as the government points

out, evidence of the attempted robbery was important to show Scott's knowing participation in the robbery that followed and was relevant to Johnson's identity as the driver during the asportation phase of the robbery. Conversely, evidence of the robbery, collision, and appellants' ensuing flight on foot tended to prove Scott's identity as Childs' assailant earlier, an important issue since she was unable to make an identification.

We find no error, therefore, in the trial judge's conclusion that this constellation of facts met the "common scheme or plan" basis for joinder under Rule 8(b). While our decisions have been properly critical of the indiscriminate joinder of offenses under Rule 8(b), the exceptionally close temporal and spatial relationship of these offenses and the necessary overlap of proof among them satisfies us that they were a single "series of acts or transactions constituting an offense or offenses" within the meaning of Rule 8(b). We likewise reject the argument that the judge abused his broad discretion by not severing the offenses under Super.Ct.Crim.R. 14.

## IV.

Appellants both contend that the trial court abused its discretion in failing to declare a mistrial because of improper argument by the prosecutor in her rebuttal summation. Appellants rightly point to the particular danger of prejudice when the prosecutor exceeds proper bounds of argument in rebuttal, since the defense cannot respond. *Carpenter v. United States,* 635 A.2d 1289, 1296–97 (D.C.1993). On more than one occasion the prosecutor let her

---

10. We reject Scott's argument that the judge's definition of asportation in regard to felony murder deviated prejudicially from established law in this jurisdiction by not requiring the jury to find that the defendants were still "dissatisfied with the location of the stolen goods immediately after the crime." *See United States v. Barlow,* 152 U.S.App.D.C. 336, 344, 470 F.2d 1245, 1253 (1972). We perceive no material distinction between this and the instruction the court gave, focusing on whether "the property has been removed to a safe location and the defendant has effected his escape with the property." *See id.* at 345, 470 F.2d at 1254 (referring to "securing the fruits of the crime").

Scott's related, but non-instructional, argument that the robbery had ended as a matter of

law before the police pursuit began has no merit. On the evidence presented, the jury readily could find that the asportation phase of the robbery was continuing at the time of the fatal accident. *See Carter,* 96 U.S.App.D.C. at 42, 223 F.2d at 334; *People v. Kendrick,* 56 Cal.2d 71, 14 Cal. Rptr. 13, 23, 363 P.2d 13, 23 (1961) (en banc); *People v. Gladman,* 41 N.Y.2d 123, 390 N.Y.S.2d 912, 916, 359 N.E.2d 420, 424 (N.Y.1976). The fact that the officer who began the pursuit did so because he witnessed a traffic violation is of no moment—the officer's unawareness of the robbery had no bearing on whether the robbery was continuing. *Gladman,* 390 N.Y.S.2d at 917, 359 N.E.2d at 425.

gladiatorial instincts get the better of her judgment. Particularly in view of the corrective measures repeatedly taken by the trial judge, however, we are not convinced that the challenged remarks, individually or in the aggregate, make a case for reversal.

## A. Attacking the defense

■ Appellants cite three remarks by the prosecutor which they say attacked defense counsel personally and insinuated that the defense was a fabrication. First, the prosecutor summoned up indignation, saying "[s]hame on you both of you," after counsel for both defendants argued that government witnesses had lied to support the prosecution theory. The prosecutor's scolding usurped the role of judge (assuming criticism of her opponents was even warranted), as the government concedes on appeal and as the trial judge recognized. He sustained objections and told the jury that the comment was "completely inappropriate" and to disregard it. This corrective action was sufficient.

■ The prosecutor went on to describe a defense argument as "ridiculous." [11] This remark may have been ill-mannered but it was not clearly improper. *See Scott v. United States*, 619 A.2d 917, 928 (D.C.1993) (remark that defense theory was "absolutely ludicrous" not improper in context). Some rhetorical latitude is fairly allowable for response to a defense argument that a key witness had "purposefully deceived" the jury. See note 11, *supra.* In any event, we rely on

the good sense of the jury to have discounted the prosecutor's hyperbole.

■ Third, appellants contend that the prosecutor told the jury that each defense attorney was asserting his or her client was the passenger rather than driver of the jeep as an expedient, but legally infirm, means to avoid liability—in short, that the defenses were fabricated. [12] Our decisions criticize this sort of motive-analysis of defense counsel as a substitute for summarizing the evidence. *E.g., Sherer v. United States*, 470 A.2d 732, 742 (D.C.1983), *cert. denied*, 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984). At the same time, the prosecutor *was* entitled to note the incongruity of both defendants' claiming to be the passenger, and to argue—as she did immediately—"that it doesn't make one bit of difference" if one defendant drove the get-away car and the other was an accomplice. Conviction in this case did not depend on which of the defendants was driving the jeep; hence, although we disapprove of the prosecutor's · remark, there is little danger that it influenced the jury on a central issue and so was "substantially prejudicial." *Coreas v. United States*, 565 A.2d 594, 600 (D.C.1989).

## B. Mischaracterizing the defense and inflaming the jury.

■ Appellants next argue that the prosecutor used a mischaracterization of the defense as a means to invoke a horrific image of bodies flying and thereby inflame the jury. [13] The judge sustained objection to the

---

11. The context was this:

> And so Ms. Fam wants you to believe, the defense wants you [to] believe, that Officer Farr couldn't possibly have seen what he said he saw; police officer chasing two people, looking for two people, seeing the vehicle that's wanted broadcast with two people in it. Ridiculous.

The prosecutor was responding to Johnson's counsel's argument that "Officer Farr is purposefully deceiving you on [when he got out of the car] because he wants you to believe he was right up close [when he saw the defendants] and couldn't be wrong, okay? But you know he's deceiving you on that point...."

12. Ms. Fam wants you to believe that her client, Mr. Johnson, was not the driver of the vehicle. Now, Ms. Gharahi and Mr. Moore, on the other hand, want you to believe that their

client was not the driver of the vehicle. Why is that?

> Well, I think—excuse me—the Government would submit to you that that's because their argument to you would be the passenger had nothing to do with it, so *I'm going to tell you my client was the passenger.* [Emphasis added.]

13. The prosecutor argued:

> He [Officer Farr], I submit to you, is a diligent, hard-working police officer who was not going to let these two people get by him. And they [the defense] want to fault him for that.
> What they want to fault him for is that he was not focused on poor little Nidya Puerta and her brother, who got hit by the vehicle, who Mr. and Ms. Mornod saw flying—

remark in question and told the jury that "that's not what the defense was arguing," admonishing the prosecutor to "try to limit [her argument] to the evidence." While there was indeed testimony that a witness saw "the boy flying" upon being struck, the prosecutor's injection of that image into her rebuttal of a (mischaracterized) attack on Officer Farr's testimony appears to have been gratuitous. The judge's immediate corrective action, however, was sufficient to neutralize any prejudice.

■ Appellants further object to the prosecutor's oration about the "blanket of protection" which the felony murder statute throws over "*our community,*" running "all the way from Varnum [Street] and all the way down to 16th," "protect[ing] our community all the way." The judge immediately sustained objection and told the jury that "there's no issue of protecting our community in this case. You need to just decide based on the evidence whether the Government's proven their case." Prosecutors should know that any mention of "community" in closing argument, whether as the subject or addressee of a "message," *e.g., Powell v. United States,* 455 A.2d 405, 410 (D.C. 1982), or as the ultimate object of the law's (or this verdict's) "protection," is mischievous and thus forbidden. Nonetheless, the judge's intervention and instruction redirected the jury to the proper issue.

### C. Misstating the law

■ The prosecutor told the jury at one point that "gross recklessness in connection with a felony equals felony murder, no matter how much the defense does not like that—...." Although the basis for appellants' objection below is not clear, they take issue on appeal, not with the aside about the defense's likes or dislikes, but with the injection of "gross recklessness" into the definition of felony murder. The prosecutor evidently was anticipating the judge's in-

struction, correct under the law, that "[t]he Government need not prove that the defendant specifically intended to kill the decedent. Any killing even if done without specific intent to kill and *even if accidental* is first degree felony murder if done during the course of a robbery" (emphasis added). But we agree with appellants that the reference to recklessness introduced a potentially misleading—because overly simplistic—tort formulation into the jury's consideration of the crime, not reflected in the standard instruction we dealt with in part II, *supra.* However, following the rebuttal argument the judge instructed the jury carefully on the elements of the crimes, including felony murder. As the exact prejudice appellants claim to have suffered from the reference to "gross recklessness" is elusive, we are confident in assuming that the jury followed the judge's definition of the offense. *E.g., Smith v. United States,* 315 A.2d 163, 167 (D.C.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974).

### D. Undermining the presumption of innocence.

■ Again in rebuttal, the prosecutor argued that "the Government has charged these two people [with] felony murder ... because these two people committed a felony murder in this case." Appellants see this as the equivalent of, "The government would not be prosecuting these people if they were not guilty." [14] Appellants did not object to the comment, however, and in that context we are unwilling to speculate that the jury gave the utterance its most prejudicial meaning: that the fact alone of indictment, certified by the United States, was proof of guilt. [15] The judge instructed the jury that the indictment was not evidence and that the presumption of innocence remains with the defendant throughout the trial unless and until he is proven guilty beyond a reasonable

---

14. Statements of the latter sort, of course, have been condemned. *E.g., United States v. Jordan,* 258 U.S.App.D.C. 143, 147, 810 F.2d 262, 266, *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1963, 95 L.Ed.2d 535 (1987).

15. The government argues on appeal that the remark was a permissible curative to Johnson's counsel's statement in argument that "this case was overcharged.... [T]he conduct in this case does not amount to felony murder."

doubt. We detect no plain error.[16]

## V.

For the foregoing reasons, the judgments of the Superior Court are

*Affirmed.*

SCHWELB, Associate Judge, concurring:

I concur in the judgment and join the opinion of the court. I write separately, however, lest our affirmance of Scott's murder conviction be perceived as having disposed of an issue which is fairly presented by the record, but which has not been raised by counsel or decided by this court.

Like Johnson, Scott was convicted, *inter alia,* of felony murder, and sentenced to serve twenty years to life for that offense.[1] So far as this record reveals, Scott was sitting in the Jeep Cherokee when Johnson committed the predicate felony for the two men's murder convictions by snatching Ms. Conroy's purse. Subsequently, Scott was a passenger in the same vehicle when Johnson, seeking to avoid apprehension by pursuing officers, plowed into a bus stop, killing a four-year-old girl.

Proportionality is the hallmark of any rational and fair system of criminal justice and, notwithstanding the tragic consequences of this criminal venture, I apprehend that such proportionality may be lacking as to Scott. As Judge Traynor stated for the court in a different but related context in *People v. Washington,* 62 Cal.2d 777, 44 Cal.Rptr. 442, 402 P.2d 130 (1965) (en banc),

[t]he felony-murder rule has been criticized on the grounds that in almost all cases in which it is applied it is unnecessary and that it erodes the relation between criminal liability and moral culpability.... Although it is the law in this state ..., it should not be extended beyond any rational function that it is designed to serve.

*Id.,* 44 Cal.Rptr. at 446, 402 P.2d at 134 (citations omitted).

A number of decisions in this jurisdiction have addressed the liability of an aider or abettor, *see* D.C.Code § 22–105 (1989), under our felony murder statute, D.C.Code § 22–2401 (1989). *See, e.g., Prophet v. United States,* 602 A.2d 1087, 1094–95 (D.C.1992); *Christian v. United States,* 394 A.2d 1, 48–49 (D.C.1978) (per curiam), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); *Waller v. United States,* 389 A.2d 801, 807 (D.C.1978), *cert. denied,* 446 U.S. 901, 100 S.Ct. 1824, 64 L.Ed.2d 253 (1980); *cf. Marshall v. United States,* 623 A.2d 551, 557–58 (D.C.1992); *id.* at 559–62 (Ferren, J., dissenting). This court held in each of these cases that a participant in an armed robbery may properly be convicted of felony murder where someone is shot to death during the course of the venture, irrespective of the lack on the defendant's part of an intent to kill the victim. We stated in *Prophet* that "[a]ll accomplices are culpable for the resulting death," 602 A.2d at 1095 (quoting *West v. United States,* 499 A.2d 860, 866 (D.C.1985)), and that "[o]nly intent to commit the underlying felony need be proved." *Id.* (quoting *Waller,* 389 A.2d at 807) (italics omitted). These decisions make sense because, in the words of a leading treatise:

Even though [two co-felons, A and B] have made [no agreement to rob X by killing him], if in the process of robbing or attempting to rob X, B's gun goes off accidentally, killing X, A would be guilty of the felony murder of X as much as B would be, under the rule concerning parties to crime that all parties are guilty for deviations from the common plan which are the *foreseeable consequences* of carrying out the plan (an accidental shooting during an armed robbery being a typical example of a foreseeable deviation from the plan to rob).

---

16. The prosecutor's description in opening statement of how an accident that "most people" initially thought was just "a traffic fatality" proved to be, upon investigation, a felony murder, while questionable as an opening statement, did not invite the jury to presume appellants' guilt.

1. The trial judge ordered that the shorter sentences which Scott received for the other crimes arising out of this incident be served concurrently with his sentence for felony murder.

WAYNE LaFAVE & AUSTIN SCOTT, JR., HAND-BOOK ON CRIMINAL LAW § 71 at 553 (1972) (quoted in *Prophet, supra,* 602 A.2d at 1095 n. 12) (emphasis added in *Prophet*).

In *Prophet, Christian,* and *Waller,* as in the hypothetical situation described by La-Fave and Scott, the aider and abettor joined a criminal venture in which, at least, a confederate was armed. The availability of the firearm provided the means by which the robbery could be carried out, and its use was readily foreseeable. This case, however, is quite different. Neither Johnson nor Scott is alleged to have been armed, and death was not a foreseeable consequence of the criminal venture.

I do not think that these considerations could help Johnson. Having driven off in the stolen vehicle at a high rate of speed and ignored traffic laws, Johnson is in no position to complain that his own recklessness was an unforeseen event which interrupted the causal link between the predicate felony and the death of the young decedent. It is difficult to see, on the other hand, how Scott could reasonably be expected to anticipate that Johnson, in seeking to elude the police, would turn the Jeep Cherokee, during a comparatively short ride, into an instrument of death. To me, it is an open question whether the reasoning of cases like *Prophet, Waller,* and *Christian,* albeit sometimes phrased in sweeping language, is to be carried over to a situation like the present one, in which the protagonists were unarmed. *See, e.g., United States v. Alston,* 580 A.2d 587, 594 n. 12 (D.C.1990) (language in opinions must be construed in light of the facts before the court, and may not be uncritically applied to different factual scenarios).

Scott's counsel, however, has not raised this issue. Although he has challenged the sufficiency of the evidence, he has done so entirely on grounds common to his client and to Johnson, arguing in this connection that the lack of immediate pursuit after the robbery, as well as the stop sign violation, interrupted the causal connection between the robbery and the decedent's death. Nowhere in Scott's submission is there any contention that Johnson's reckless operation of the vehicle was not foreseeable to Scott, and that it

differentiated his own legal situation from Johnson's. Similarly, Scott has not included in his criticism of the trial judge's instructions to the jury any contention based on Johnson's driving, nor did he request an instruction in the trial court along the lines suggested in this opinion. Accordingly, the question which I have identified is not before us for decision—indeed, the government has not had any occasion to address it—and the opinion of the court is not to be construed as having decided it.

FERREN, Associate Judge, dissenting:

In this felony murder case, everyone agrees with the proposition, drawn from *United States v. Heinlein,* 160 U.S.App.D.C. 157, 168, 490 F.2d 725, 736 (1973), that there must be enough of a causal connection between the felony and the homicide that "the killing can be said to have occurred *as a part of the perpetration of the crime.*" (Emphasis added.) In the case of a robbery, "perpetration" includes flight from the scene carrying the stolen goods. *See Head v. United States,* 451 A.2d 615, 625 (D.C.1982). We therefore confront this question: how much "a part of the perpetration" of the robbery—including flight from the robbery—must the homicide be?

The answer is straightforward: the felony must be a legal cause of the homicide. *See People v. Aaron,* 409 Mich. 672, 299 N.W.2d 304, 312–16 (1980); W. LaFAVE & A. SCOTT, 2 SUBSTANTIVE CRIMINAL LAW § 7.5(d), at 213 (1986); II MODEL PENAL CODE AND COMMENTARIES § 210.2, at 29–43 (1980); *see generally Marshall v. United States,* 623 A.2d 551, 559–61 (D.C.1992) (Ferren, J., dissenting in part and concurring in the result only). This means the death must have been a "natural and probable consequence" of the felony, *i.e.,* "proximately caused" by acts within the scope of the felony. *See id.*

Legal causation is not necessarily limited to causation by one actor or event; there can be multiple legal causes. I am therefore persuaded that the felony murder rule will be unfairly harsh and unjust—especially in an attenuated case, such as this, where flight from the scene is deemed part of the crime—unless a jury reasonably can find, and is

instructed it must find, that the felony at least was a "substantial factor" (among others) in the chain of causation from felony to death; a minor factor cannot be a legal cause. *See Baylor v. United States*, 407 A.2d 664, 670 (D.C.1979) (medical malpractice not intervening cause of victim's death in homicide case where defendant's action—a blow to the side rupturing spleen—"contributed substantially to death"); *cf. Dalo v. Kivitz*, 596 A.2d 35, 41–42 (D.C.1991) (in legal malpractice action, liability predicated on finding injury proximately caused by tortious act that played "central role," or was "substantial factor," in injury) (quoting *District of Columbia v. Freeman*, 477 A.2d 713, 716 & n. 9 (D.C.1984)); *Lacy v. District of Columbia*, 424 A.2d 317, 319 (D.C.1980) (adopting "substantial factor" test for proximate cause in civil action for assault and battery). Although legal causation analysis is not necessarily the same under criminal and tort law, the foregoing case law recognizes that, under either regime, every cause resulting in liability, whether criminal or civil, must contribute substantially to the result.

The trial court's instructions initially may have satisfied the "substantial factor" causation test by telling the jury that, for conviction, the robbery (including transportation of the stolen goods) must have been "ongoing" at the time of the murder *and* that the speeding (*i.e.,* the "specific actions leading to the fatal injuries") must have comprised "part of the defendant's efforts to successfully complete the robbery." *Ante* at 432. This first part of the instructions in effect told the jury that, to find guilt, it must find that the speeding was part of a conscious "effort[ ]" to complete the robbery; this language arguably expressed a "substantial factor" requirement.

But then the court pulled back. It added that the speeding ("specific actions leading to the fatal injuries") must have been "motivated *at least in part* by the defendant's desire to avoid apprehension with the stolen property." (Emphasis added.) Appellants contend,

and I agree, that this follow-up language diluted whatever "conscious effort" implication there was in the preceding part of the instruction so that the jury, in effect, was told it could find causation even if the robbery comprised only a minor—not substantial—"part" of the reasons for the speeding that directly led to the death.

In its brief, and under direct questioning at oral argument on appeal, the government did not shy away from appellants' reading of the instruction. First, the government acknowledged it did not believe there is a "substantial factor" component to the legal cause of felony murder. Second, the government candidly conceded that the trial judge himself interpreted the instructions as appellant does, and that for this reason the prosecutor was permitted to make a "minor factor" argument to the jury, as follows: "it doesn't matter, as long as you find that in *any* part, in *any* way, they were motivated to avoid police apprehension because sitting right there in that vehicle were the proceeds of a robbery that they committed six minutes before." (Emphasis added.)

If the substantial factor test applies—as I believe it does (and as my colleagues intimate they would approve if not prefer, see *ante* at 434) [1]—then the trial court erred in failing to make that test clear to the jury. I cannot agree with the majority that the short, "five to ten minute interval between the robbery assault and appellants' sighting by the police" necessarily made the other two identified causal factors—appellants' "possession of a stolen vehicle and their having just ignored two stop signs," *ante* at 432—so insignificant in the decision to flee from the police that the jury, even as instructed, inevitably had to find that the robbery was a substantial factor in the child's death, not a lesser one. Certainly the jury on this record could have found the required substantial factor, but the factual record and the instruction—as the government concedes—allowed less.

---

1. The "substantial factor" test—regularly employed by juries in this jurisdiction, especially in tort cases—does not require the factfinder to "quantify the respective significance—to 'evaluate the strength'—of different causal factors" or

to "assign a percentage causal weight approaching if not exceeding fifty percent." See *ante* at 434. The majority's worries in this regard are unfounded.

In applying the trial court's dilution language ("at least in part") to the facts here, see *ante* at 434–435, the majority implicitly accepts a "substantial factor" requirement and finds "no error" based on "harmless error" reasoning. Especially, however, in a multiple legal cause situation such as this case appears to be, it is not for this court to cure the instructional lapse—called to the judge's attention at trial—by ruling on the basis of how we, as appellate judges, think the jury must have performed its task. Because the jury, if properly instructed, could have ruled either way on this record, not necessarily as my colleagues believe it did, the instructional error was not harmless. *See White v. United States*, 613 A.2d 869, 877 (D.C.1992) (en banc) (instructional error subject to "harmless error" analysis).

I would reverse and remand for a new trial with proper felony murder instructions expressly incorporating the "substantial factor" test. Respectfully, therefore, I must dissent.