ther tend to substantiate appellant's contention that the verdict was coerced.[46]

On the record before us (disregarding entirely, however, the post-verdict statements of the jurors), we are unable to "say with assurance that the jury arrived at its verdict freely and fairly."[47] "[C]oercion was probable, if not certain. Thus prejudice is presumed, and reversal is mandatory."[48]

### III.

For the foregoing reasons, we vacate appellant's convictions and remand this case for a new trial.[49]

*So ordered.*

**In re D.N., Appellant.**

**No. 09–FS–607.**

District of Columbia Court of Appeals.

Argued March 28, 2012.
Decided May 2, 2013.

---

Christine A. Monta, Public Defender Service, with whom James W. Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Janice Y. Sheppard, Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for appellee District of Columbia.

Before FISHER and OBERLY, Associate Judges, and WAGNER, Senior Judge.

FISHER, Associate Judge:

Following a bench trial, D.N. was convicted of one count each of felony murder,[1] robbery,[2] conspiracy to commit robbery,[3] receiving stolen property,[4] and felony destruction of property,[5] all in connection with the robbery and murder of Ronald Robinson in the summer of 2008. After Eric Palmer and D.N. beat and robbed Robinson of his money and car keys, Palm-

---

1. D.C.Code § 22–2101 (2001).

2. D.C.Code § 22–2801 (2001).

3. D.C.Code § 22–1805a (2008).

4. D.C.Code § 22–3232(a), (c)(2) (2001).

5. D.C.Code § 22–303 (2001).

er and a man identified as "Fat Sean" continued to bludgeon Robinson, whose body was found on the scene. On appeal, D.N. argues that the evidence was insufficient to prove that the killing of Robinson was committed "in furtherance of" the common scheme to rob him, and that, at the very least, a remand is required because the trial court applied an improper legal standard for accomplice liability when it concluded that D.N. was guilty of felony murder. D.N. also argues that the adjudications should be reversed because the trial court based its verdicts on a clearly erroneous factual finding. We disagree with D.N.'s arguments and affirm.

## I. Facts

In early July 2008, D.N. and Palmer were walking down the street when they saw Ronald Robinson ("Dudaman") and decided to rob him. The testimony of Michael Hickman, a government informant, provided the primary evidence that D.N. was involved in the robbery. Hickman was not present when the robbery and murder took place, but he testified that D.N. admitted his involvement several weeks after the killing and then again at a later date when the government arranged for Hickman to record a conversation with D.N. That video and audio recording, although of poor quality, was admitted into evidence.

According to Hickman, D.N. said "they seen Dudaman and they decided to rob him." Hickman later clarified that "[i]t was more like Eric [Palmer] decided to rob [Robinson], and [D.N.] was with him." The two men started "whooping [Robinson]" in an alley, meaning that "they just started beating him." When Hickman was asked if D.N. said "what if anything was used to whoop the victim in this case?," Mr. Hickman said "No." [6] At some point Palmer told D.N. to "get [Robinson's] jeans." D.N. "stopped and went in the dude's pockets," taking "$45 and a set of car keys." "Eric continued to beat him and put him in the trash can." D.N. "said he was trying to get the car started[,]" but it "wouldn't start or something."

D.N. "was about to walk off" when he looked and saw Robinson climbing out of the trash dumpster. Joined by someone named "Fat Sean," who emerged on the scene sometime after the robbery began (the record does not make clear when or how), Palmer then resumed beating Robinson. D.N. claimed that he "just stood back[,]" taking "no part in it."

Evidence at trial presented a gruesome scene. When investigating the crime, Detective John Bevilacqua and other officers found Robinson's body lying in a pool of blood next to a dumpster in the alley. He was clad in his socks and underwear. Robinson's jeans were lying on the ground near the driver's side of his car. His body was covered with "debris ... from the cinder block ... [and] the red bricks" lying nearby.

It appeared that the assault had commenced in front of a blue Buick, where a pool of blood had formed. According to Detective Bevilacqua, "You could follow, literally follow the blood trail, from where the decedent was found to the first smaller dumpster, and then back from there to the—in front of this vehicle." Two bricks appeared to be missing from a nearby

---

**6.** The dissent suggests that D.N. told Hickman the "whoopin'" was "real basic." *Post* at 98. It appears, however, that Hickman instead was saying that D.N. gave only a "real basic" description of the beating. The colloquy proceeded as follows:

Q. Did Mr. D.N. say—what words did he use to describe the beating?
A. It was like real basic, it was like he just started whooping him. It wasn't like how they get started, say they just started beating him.

retaining wall. Half of a brick was under the Buick. In the pool of blood was a "fragment" which looked like "the [concrete] core of one of the bricks missing from the retaining wall." Several pieces of broken cinderblock were lying nearby.

Parked near the Buick was a black Chrysler with a smashed window and "personal effects ... strewn" around. D.N.'s fingerprint was found on the Chrysler, and he admitted to police that he broke into it. Robinson's Chevy Impala was nearby, unlocked, with keys in the ignition. Robinson's wife testified that when her husband's car was returned to her, the keys were missing. None of the prints recovered from the Buick or the Chevy matched D.N.

Robinson's body "was partially covered with caked blood and had several injuries characterized as abrasions, contusions, and lacerations to the head, to the torso, to the extremities." His skull was fractured and "there was a lot of hemorrhage under the scalp, on the left and the right side." The medical examiner found "fragments of concrete" in the wounds on Robinson's head. The cause of death "was major blunt impact injuries," apparently caused by "the piece of concrete whatever it is that was used, but the heavy object that was used."

The trial court specifically credited Hickman's testimony and noted that it had "re-listen[ed] to the wire several times[.]"

[I]t's very clear that your client said that he just wanted to get out of there. He had his money, referring to the victim in this case. And I will say that it's clear to me that your client was participating in this robbery. It's also clear to me that he wanted to get out of there, and didn't want to do further damage to the victim. Unfortunately, felony murder doesn't involve an intent to do the murder. It involves an intent to do the underlying crime.

The trial court found D.N. "guilty of the robbery, and thereafter the felony murder[.]" However, the court acquitted D.N. of the "while armed" elements of the robbery and felony murder charges. Although the court acknowledged D.N.'s statement that he and Palmer had "whooped" Robinson, it commented that this "could easily have [referred to] a beating or a kicking, or a punching."

## II. Legal Analysis

### A. Sufficiency of the Evidence

Felony murder is an exception to the general requirement that the government must prove premeditation and deliberation to sustain a conviction of first-degree murder. The first-degree murder statute provides that "any person who kills another while perpetrating or attempting to perpetrate a robbery, or one of the other enumerated felonies, is guilty of first-degree murder." *Christian v. United States*, 394 A.2d 1, 48 (D.C.1978).[7] Moreover, the government need not prove intent to kill. With felony murder, "[o]nly

---

7. At the time of this offense, D.C.Code § 22–2101 provided:

Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison, or in perpetrating or attempting to perpetrate an offense punishable by imprisonment in the penitentiary, or without purpose to do so kills another in perpetrating or in attempting to perpetrate any arson, as defined in § 22–301 or § 22–

302, first degree sexual abuse, first degree child sexual abuse, first degree cruelty to children, mayhem, robbery, or kidnapping, or in perpetrating or attempting to perpetrate any housebreaking while armed with or using a dangerous weapon, or in perpetrating or attempting to perpetrate a felony involving a controlled substance, is guilty of murder in the first degree....

D.C.Code § 22–2101 (2008).

intent to commit the underlying felony need be proved." *Waller v. United States,* 389 A.2d 801, 807 (D.C.1978). We recently reiterated "the underlying purpose of the felony murder doctrine, which is designed to deter the commission of certain especially dangerous felonies because these particular crimes create an unacceptably high risk of death...." *Wilson–Bey v. United States,* 903 A.2d 818, 835 (D.C. 2006) (en banc).

 There must, however, be a "causal connection between the homicide and the underlying felony." *Johnson v. United States,* 671 A.2d 428, 433 (D.C. 1995). "Mere temporal and locational coincidence is not enough: '[i]t must appear that there was such actual legal relation between the killing and the crime ... that the killing can be said to have occurred *as a part of the perpetration of the crime* ....'" *Id.* (quoting *United States v. Heinlein,* 490 F.2d 725, 736 (D.C.Cir.1973) (additional citation omitted) (emphasis added in *Johnson* )); *see also* D.C.Code § 22–2101, *supra* note 7 ("in perpetrating or in attempting to perpetrate any ... robbery").

 "By its terms, ... the first-degree murder statute imposes felony murder liability solely on the person who does the killing." *Christian,* 394 A.2d at 48. An accomplice to the felony may be convicted of felony murder only "in accordance with common law concepts of vicarious liability." *Id.* "The accomplice who aids and abets is criminally liable for a killing by the principal only if the killing is done 'in furtherance of the common design or plan to commit the [underlying] felony, or [is] the natural and probable consequence of acts done in the perpetration of the felony.'" *Butler v. United States,* 614 A.2d 875, 886 (D.C.1992) (quoting *Heinlein,* 490 F.2d at 735). "Thus the government must prove that the killing was done in furtherance of the underlying felony when it seeks to make an aider and abettor who did not actually do the killing liable for felony murder." *Butler,* 614 A.2d at 886. "[T]here is no criminal responsibility on the part of an accomplice if the homicide is a fresh and independent product of the killer's mind, outside of, or foreign to the common design." *Christian,* 394 A.2d at 48; *see also Butler,* 614 A.2d at 886 ("When one of the parties to a felony commits a killing 'outside the scope of the felonious crime which the parties undertook to commit,' the aiders and abettors of the felony cannot be convicted of felony murder." (quoting *Heinlein,* 490 F.2d at 737)).

 Importantly, however, "the homicide itself need not be within the common design[.]" *Heinlein,* 490 F.2d at 736 (citation omitted). "'If the lethal act is in furtherance of their common purpose, the accomplice is guilty even though there was an express agreement not to kill, and even if he actually attempts to prevent the homicide.'" *Lee v. United States,* 699 A.2d 373, 385 (D.C.1997) (quoting *Heinlein,* 490 F.2d at 736 (additional citation omitted)). *Cf. Prophet v. United States,* 602 A.2d 1087, 1094–95 (D.C.1992) (rejecting argument that accomplice must also have aided and abetted the killing itself).

 D.N. argues that the fatal bludgeoning was a fresh and independent impulse on the part of Palmer because: (1) "the robbery was complete in all but the most technical sense" when Palmer put Robinson in the dumpster; (2) when Robinson started climbing out, a third person joined Palmer while D.N. stood back; and (3) for the first time weapons ("bricks, broken pieces of concrete, and a wooden board") were used in the beating. The government counters "that the beating was brutal even before Fat Sean joined" and

Palmer simply "resumed beating Robinson" because "he realized that throwing [Robinson] into the dumpster failed to keep him contained[.]"

Although the trial court found the evidence insufficient to support a finding beyond a reasonable doubt that D.N. had used any weapons, we cannot say that the beating death was outside the scope of D.N. and Palmer's "common design" to rob and "whoop" Robinson. As D.N. conceded at oral argument, had Robinson been beaten to death before Palmer dragged him to the dumpster, D.N. would be liable for felony murder. The arrival of Fat Sean and the use of bricks and concrete fragments (readily available on the scene) do not break the relatively seamless chain of events leading to Robinson's death.

Nor is it accurate to suggest that the robbery was over. Discussing the sufficiency of evidence to support a felony murder conviction, we have explained "that the crime of robbery is a continuing offense as long as the asportation of the goods continues." *Head v. United States*, 451 A.2d 615, 625 (D.C.1982). We take this principle seriously. *See Johnson*, 671 A.2d at 430 (upholding "felony murder convictions, arising from a vehicular homicide committed during the asportation (or 'carrying away') phase of a robbery and flight from the police"); *Carter v. United States*, 223 F.2d 332, 334 (D.C.Cir.1955) (although there was a "slight interval" between robbery and pursuit by police officer who was fatally shot, "[w]e have no doubt that the appellant had not secured to himself the fruits of the robbery, but was still feloniously carrying away the stolen money when [the officer] began the chase"); *see also* CHARLES E. TORCIA, 2 WHARTON'S CRIMINAL LAW § 150, at 310–11 (15th ed. 1994) (for purposes of felony murder, felony is deemed to be still in progress if defendant has not left scene or if defendant is fleeing scene). Here, D.N. and Palmer had not carried away the proceeds when the fatal blows were inflicted. Indeed, their victim was stubbornly refusing to submit. A rational finder of fact certainly could conclude that keeping Robinson subdued furthered the common design to successfully complete the robbery.

■ Accomplices also are liable for felony murder "if the killing ... [is] 'the natural and probable consequence of acts done in the perpetration of the felony.'" *Butler*, 614 A.2d at 886 (quoting *Heinlein*, 490 F.2d at 735). Although our felony murder cases do not explain the concept of natural and probable consequences in much detail, it at least encompasses the requirement of a "causal connection between the homicide and the underlying felony." *Johnson*, 671 A.2d at 433. Surely the death of Robinson was a natural and probable consequence of a robbery committed in this brutal fashion.[8] Many of our cases have demonstrated that death often follows even an unarmed beating. This is especially true when two are gang-

---

**8.** In *Wilson–Bey*, 903 A.2d 818, we concluded that the "natural and probable consequences" language contained in a standard aiding and abetting instruction impermissibly relieved the government of the burden of showing that the accomplice had the *mens rea* required to be guilty of the offense. That holding does not apply here. "As our opinion in *Wilson–Bey* explains, it is not error to give the 'natural and probable consequence' instruction with respect to a felony murder charge based on an enumerated felony, because an intent to kill does not need to be proved for a defendant to be convicted on such a charge, either as a principal actor or as an aider and abettor." *Kitt v. United States*, 904 A.2d 348, 355 (D.C.2006). *See Wilson–Bey*, 903 A.2d at 837 n. 33 (noting that court's holding "does not apply to felony murder, misdemeanor manslaughter, or conspiracy, all of which the law treats differently").

ing up on one. *See, e.g., Strozier v. United States,* 991 A.2d 778, 790 (D.C.2010) ("Appellant committed a crime by assaulting the victim, and the victim died as a result of naturally succeeding events."); *Owens v. United States,* 982 A.2d 310 (D.C.2009) (beating death); *Comber v. United States,* 584 A.2d 26, 32–33 (D.C.1990) (en banc) (punches to head caused death); *id.* at 54 ("[A]n intentional act which causes death is involuntary manslaughter if it is a misdemeanor dangerous in and of itself which is committed in a manner such that appreciable bodily injury to the victim was a reasonably foreseeable result."); *Stack v. United States,* 519 A.2d 147 (D.C.1986) (fatal hematoma caused by being struck in the face).

Some have argued that, where accomplice liability for felony murder is concerned, "reasonable foreseeability" is "an appropriate interpretation of 'natural and probable consequences[.]' " *See Marshall v. United States,* 623 A.2d 551, 563 (D.C. 1992) (Ferren, J., dissenting in part and concurring in the result only); *but see Prophet,* 602 A.2d at 1095 (rejecting a "reasonably foreseeable" gloss). Even this more restrictive test would not benefit appellant. It was entirely foreseeable that death might result from a "whoopin' " inflicted by two men, even if they were not armed. *See Hammon v. United States,* 695 A.2d 97, 107 (D.C.1997) ("The government's expert testified that Fisher died from head trauma consistent with either a blow to the head or a fall on the concrete stairs where he had been standing. Either means ... would be a direct, foreseeable result of appellants' fight with Fisher.").

▮ Under these circumstances, it is no defense that D.N., according to the trial court, may have "wanted to get out of there, and didn't want to do further damage to the victim." Withdrawal is no

defense to accomplice liability unless the defendant "take[s] affirmative action to disavow or defeat the purpose, or definite, decisive and positive steps which indicate a full and complete disassociation." *Harris v. United States,* 377 A.2d 34, 38 (D.C. 1977). Nothing like that happened here. *Cf. Plater v. United States,* 745 A.2d 953, 958 (D.C.2000) ("The defendants' fleeing of the crime scene after participating in the assault does not constitute legal withdrawal."). Even if D.N. regretted the unfolding consequences of the brutal robbery in which he participated, that does not relieve him of criminal liability. As we previously explained, " '[i]f the lethal act is in furtherance of their common purpose, the accomplice is guilty even though there was an express agreement not to kill, and even if he actually attempts to prevent the homicide.' " *Lee,* 699 A.2d at 385 (quoting *Heinlein,* 490 F.2d at 736 (additional citation omitted)). No evidence supports— much less compels—a finding that D.N. withdrew from the robbery.

**B. The Trial Court's Legal Conclusion**

In its oral ruling, the trial court focused on D.N.'s argument that he did not intend to kill, noting that felony murder does not require proof of intent to kill but "involves an intent to do the underlying crime. And I do believe he had the intent to do the underlying crime, and that ... the murder occurred as a result of the beginning of that robbery." D.N. argues that the court misapprehended the elements of felony murder as applied to accomplices because it made no finding that the fatal beating occurred "in furtherance of" the common plan to rob Robinson. D.N. asks that, at the very least, we remand the case for reconsideration.

▮ "Judges are presumed to know the law," *Cook v. United States,* 828 A.2d 194, 196 n. 2 (D.C.2003), and "trial court

judgments, which come to us with a presumption of correctness, should be upheld when there is no indication in the record that the trial court was unaware of the law's requirements." *Mattete v. United States*, 902 A.2d 113, 116 (D.C.2006). Moreover, "[i]n a case tried without a jury the Court shall make a general finding" and need not make special findings unless a timely request is made. Super. Ct.Crim. R. 23(c). "On appeal from a finding of guilt where an appellant has not asked the trial court to find the facts specially, this court will review the record to ascertain whether there is evidence of record that supports the trial judge's conclusion of guilt." *Thomas v. United States*, 985 A.2d 409, 411 (D.C.2009).

D.N. made no request for a special finding whether the killing of Robinson occurred in furtherance of the robbery or as "a fresh and independent product of the killer's mind, outside of, or foreign to the common design." *Christian*, 394 A.2d at 48. This is not surprising because D.N.'s defense at trial was mere presence. Thus, the trial court appropriately focused on D.N.'s contention that he was not involved in the robbery, announcing, "it's clear to me that your client was participating in this robbery." In addition, the court accurately explained, "felony murder doesn't involve an intent to do the murder. It involves an intent to do the underlying crime." On this record, further findings were not required, and there is no valid reason to conclude that the trial court misunderstood the doctrine of felony murder.

## C. The Challenged Factual Finding

Finally, D.N. argues that the trial court based its finding of guilt on a clearly erroneous factual finding. The court noted that Hickman's testimony was "corroborated by one interesting fact"—Robinson's wife "testified that when the car was returned to her, the keys were missing, and there was really no way in the evidence that's before me, for Mr. Hickman to know that the keys were missing, unless [D.N.] told him." Appellant now asserts that the court must have "forgot[ten] that [Detective] Bevilacqua said that the keys were still in the ignition when the police arrived." He asserts that the police must have lost the key. Appellant did not, however, bring the trial court's supposed lapse of memory to the court's attention.

▇▇▇▇ "We are not to set aside the trial court's judgment, except for errors of law, unless we find that it was plainly wrong or unsupported by the evidence." *In re C.J.*, 514 A.2d 460, 463 (D.C.1986) (citing D.C.Code § 17–305(a)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). When this demanding standard is applied, it is not at all clear that the trial court erred in thinking that the testimony of Robinson's wife corroborated Hickman's account.[9]

---

9. About a week after her husband was murdered, Mrs. Robinson saw his car at Blue Plains. There was no key for the car, but it did contain her husband's "house key, with blood on it." The trial court inferred that this testimony corroborated D.N.'s statement (to Hickman) that he took the keys from Ronald Robinson. Perhaps the more important point is that the keys were not found in Robinson's pocket.

D.N. stated on the wire recording that he tried to start a car, and, according to Hickman, D.N. said the car wouldn't start. Although the parties disagreed about whether D.N. was referring to Robinson's car or to the black Chrysler, his statements are consistent with the view that D.N. took car keys from Robinson and then tried to start his car. Perhaps he used the wrong key or perhaps there

 Nevertheless, we need not resolve this question, or remand so the trial court can address it, because any error was harmless.[10] The "interesting fact" that supposedly corroborated Hickman's testimony was not the primary basis on which the trial court credited Hickman. Before commenting on this corroboration, the trial court stated that it credited Hickman's testimony for "several reasons," including that "he did strike me as someone who was willing to tell you every prejudice he had, and still go forward with what he said happened. He was clear. He was not inconsistent in any of his testimony. His demeanor was very credible. He's also corroborated by the physical evidence on the scene." We defer to a trial court's credibility determinations unless "wholly unsupported by the evidence," *Perez v. United States*, 968 A.2d 39, 63 (D.C.2009) (internal quotation marks omitted), and there is nothing in the record to suggest that the trial judge would have discredited Hickman's testimony without the supposed corroboration provided by Robinson's wife. Therefore, " 'the judgment was not substantially swayed by [any] error.' " *In re C.J.*, 514 A.2d at 463 (quoting *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239).

## III. Conclusion

The judgment of the Superior Court is hereby

*Affirmed.*

---

were other reasons the car failed to start. Detective Bevilacqua did not say that he inspected the keys he saw in the ignition of Robinson's car, and there was no testimony that he or any other police officer was able to start Robinson's car with the keys Bevilacqua saw. This evidence, viewed in its totality, does not clearly contradict the trial court's observation.

10. If a trial court's factual findings are plainly wrong, "we must [then] determine if this er-

OBERLY, Associate Judge, dissenting:

Because I do not believe the government satisfied its burden of proving accomplice liability to felony murder, I cannot join the majority's opinion affirming D.N.'s felony murder conviction. As the majority acknowledges (*ante* at 93), when the government seeks to prosecute an accomplice to felony murder, it must prove not only an intent to commit the underlying felony and that the killing occurred in the course of perpetrating that felony, as it must prove when it seeks to prosecute principals; it must make an additional showing: that the killing was done "in furtherance of the common design or plan" to commit the underlying felony. *Christian v. United States*, 394 A.2d 1, 48 (D.C.1978) (internal quotation marks omitted); *see also Butler v. United States*, 614 A.2d 875, 886 (D.C. 1992) ("The requirement that the killing take place 'in furtherance of' the underlying felony (as opposed to 'during' or 'in the course of' the underlying felony) applies only to aiders and abettors of the actual killer.").

We have recognized the "in furtherance requirement" as a "limitation on the felony murder liability of an accomplice," holding that "there is no criminal responsibility on the part of an accomplice if the homicide is a fresh and independent product of the killer's mind, outside of, or foreign to the common design." *Christian*, 394 A.2d at 48; *see also Butler*, 614 A.2d at 886 ("When one of the parties to a felony commits a killing 'outside the scope of the

---

ror was harmless." *In re C.J.*, 514 A.2d at 463. An error is harmless if "we can 'say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[.]' " *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

felonious crime which the parties undertook to commit,' the aiders and abettors of the felony cannot be convicted of felony murder.") (quoting *United States v. Heinlein*, 490 F.2d 725, 737 (D.C.Cir.1973)). In *Heinlein*, 490 F.2d at 733, 737, the D.C. Circuit reversed the felony murder convictions of two aiders and abettors of a rape (the Walker brothers), holding that the jury should have been instructed that the Walker brothers would not be liable for the murder of the rape victim if the jury found that "Heinlein's stabbing of [the rape victim, while the Walker brothers held her down] was an unexpected response to his being slapped in the face and was independent of any common purpose to rape."

To convict an accomplice of felony murder, then, the trier of fact must identify a common purpose shared by the accomplice and the principal to commit the underlying felony and then must conclude beyond a reasonable doubt that the killing occurred in furtherance of that common purpose, and not as a "fresh and independent product of the killer's mind." *Christian*, 394 A.2d at 48.

I can find little in the record to support the conclusion beyond a reasonable doubt that the gratuitous armed assault by Palmer and Fat Sean furthered any purpose that D.N. and Palmer shared to rob Robinson. The evidence at trial showed that Robinson died of "major blunt impact injuries" caused by "a piece of concrete." When they decided to commit the robbery, however, neither D.N. nor Palmer had any weapons on them, and the trial court found that the evidence was insufficient to establish that D.N. ever used any weapons.

The primary evidence implicating D.N. came from Hickman, who described the "whoopin'" as "real basic," from what D.N. had told him.[1] The evidence supports an inference that the common plan shared by D.N. and Palmer was an unarmed robbery and "whoopin'"; the ultimate bludgeoning of Robinson with concrete fragments—after the pair had taken all there was to take from Robinson, after Palmer put Robinson in the dumpster, and after a third party unrelated to the robbery joined in while D.N. stood back—strikes me as a departure from this common plan.

I cannot agree with the majority's conclusion that "[t]he arrival of Fat Sean and the use of bricks and concrete fragments ... do not break the relatively seamless chain of events leading to Robinson's death." *Ante* at 94. On the contrary, the arrival of a third person not involved in the robbery who joined Palmer in a vicious beating far exceeded the scope of the common plan to commit an unarmed robbery. It also is significant that when they agreed to commit the robbery, neither D.N. nor Palmer had any weapons. Where the plan to commit a felony does not include the carrying of weapons, it is harder to conclude that the principal's later use of weapons falls within the scope of the shared purpose. *Cf. Perry v. United States*, 36 A.3d 799, 814 (D.C.2011) ("[T]o be legally responsible for the principal's use of a weapon during an offense ... the aider and abettor [must have] had actual knowledge that some type of weapon would be used or ... it [must have been] reasonably foreseeable to the aider and abettor that

---

1. The majority suggests that "real basic" refers not to the "whoopin'" itself but to Hickman's description of it. *Ante* at 91 n. 6. I find my reading of the transcript more natural, given that the answer comes in direct response to the question, "what words did he use to describe the beating?" Regardless, and even assuming that either reading is plausible, my point remains the same: there was little evidence that *D.N.* took part in the brutal beating.

some type of weapon was required to commit the offense.") (first and third alterations added) (internal quotation marks omitted).

The majority is correct that it does not matter that the robbery was "complete in all but the most technical sense" for purposes of the requirement that the killing have been committed *in the course of* the felony—if the robbery were complete before the killing, not even Palmer could be charged with felony murder—however, it is evidence that when Palmer and Fat Sean started beating Robinson savagely with concrete fragments it was not to further the robbery but to advance some independent, perverse interest of their own.

Although "the homicide itself need not be within the common design," *Heinlein,* 490 F.2d at 736, the act resulting in the homicide must be in furtherance of the common purpose. Here, there is no evidence that the savage armed beating by two adult men, one of whom was not involved in the robbery, furthered the shared purpose to complete the robbery— there was nothing left to take from Robin-son and he certainly posed no threat to asportation. Robinson had been rendered defenseless, dragged by Palmer into a dumpster. That Robinson was able to crawl back out does not make him a victim "stubbornly refusing to submit." *Ante* at 94. Moreover, there is no evidence, as there was in *Lee v. United States,* 699 A.2d 373, 386 (D.C.1997), for example, of D.N.'s continued involvement after Palmer placed Robinson in the dumpster; in fact, D.N. was about to walk away when the new attack began. In *Johnson v. United States,* 671 A.2d 428, 436 (D.C.1995), we upheld the felony murder conviction of an accomplice, finding no error in the instructions to the jury because they "allowed conviction *only* if the jury found that flight was part of [appellant's] 'common effort' with Johnson, 'acting together,' to complete the robbery." (Emphasis added.) On this record, I do not think the government has proven beyond a reasonable doubt that the killing by Palmer and Fat Sean was part of a common effort between D.N. and Palmer to complete the robbery and not an independent product of the two killers' minds.[2]

---

2. The majority explains that accomplices also are liable for felony murder if the killing is the natural and probable consequence of acts done in the perpetration of the felony. *Ante* at 94. As the majority acknowledges, our cases do not fully explain the concept of natural and probable consequences in the context of felony murder liability. Surely, it cannot merely "encompass[ ] the requirement of a 'causal connection between the homicide and the underlying felony,'" as the majority states, *ante* at 94 (quoting *Johnson,* 671 A.2d at 433), for a causal relationship between the killing and the underlying felony is a requirement for any felony murder prosecution. *See Lee,* 699 A.2d at 385 (quoting *Waller v. United States,* 389 A.2d 801, 807 (D.C.1978)).

In any event, I do not think the natural and probable consequences language changes the overall requirement that the killing must be done in furtherance of the common purpose to commit the underlying felony. In *Chris-*

*tian,* the case that established the standard in this jurisdiction for liability of accomplices to felony murder, we held: "The accomplice who aids and abets the commission of a felony is legally responsible as a principal for all acts of another person which are in furtherance of the common purpose, if the act done either is within the scope of that purpose, or is the natural or probable consequence of the act intended." 394 A.2d at 48 (internal quotation marks omitted). Thus, there is no accomplice liability for an act of the principal that is the natural and probable consequence of the underlying felony if that act is not also in furtherance of the common purpose to commit the underlying felony. *See Marshall v. United States,* 623 A.2d 551, 562 (D.C.1992) (Ferren, J., dissenting in part and concurring in the result only); Criminal Jury Instructions for the District of Columbia No. 4.204 cmt. (5th ed. 2011) (noting that the instructions "set forth the rule of accomplice liability for a

In light of "the modern American trend" to limit the "harsh or unjust consequences of the [felony murder] doctrine," *Marshall v. United States*, 623 A.2d 551, 559 (D.C. 1992) (Ferren, J., dissenting in part and concurring in the result only), it is particularly important to take seriously the distinction we have established between principals and accomplices in this context.[3] It seems particularly unjustified to impose felony murder liability on a juvenile who the evidence suggests did not sign up for an armed robbery that led to a bludgeoning carried out by two adults. Of course, D.N. did agree to commit crimes, and he was convicted for those crimes: robbery, receiving stolen property, felony destruction of property, and conspiracy. But convicting D.N. of felony murder as an accomplice would blur the important distinction between accomplice liability and principal liability in the felony murder context. I therefore respectfully dissent.

homicide which is in furtherance of the underlying felony or is the natural and probable consequences of acts done in furtherance of the predicate felony.").

3. Some of our cases after *Christian* have failed to adequately apply this distinction. In *Prophet v. United States*, 602 A.2d 1087, 1095 (D.C.1992), for example, this court held that the law treats accomplices the same as principals for purposes of imposing felony murder liability. Under *Christian*, however, this is not correct. The authoring judge of *Prophet* later recognized as much. *See Marshall*, 623 A.2d at 563 (Ferren, J.). In *West v. United States*, 499 A.2d 860, (D.C.1985), although the court cited *Christian* for the proposition that an accomplice is liable for the acts of the principal that are in furtherance of the common purpose, it did not apply this standard and went on to affirm the conviction of an accomplice because the government had shown that the killing was done while perpetrating a felony and, once that is shown, " 'no distinction is made between principals and aiders and abettors for purposes of felony murder liability.' " *Id.* at 866 (alterations omitted) (quoting *Waller*, 389 A.2d at 807).